J-A14002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICODEMO M. BAGGETTA | : | |
| | : | |
| Appellant | : | No. 892 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 14, 2020
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0001287-2018

BEFORE:   BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.*

MEMORANDUM BY BENDER, P.J.E.:                 **FILED AUGUST 09, 2022**

Appellant, Nicodemo M. Baggetta, appeals from the aggregate judgment

of sentence of 54 to 108 months' incarceration, followed by 6 years' probation,

imposed after a jury convicted him of institutional sexual assault, 18 Pa.C.S.

§ 3124.2(a.2)(1), endangering the welfare of a child, 18 Pa.C.S. § 4304(a)(1),

corruption of a minor, 18 Pa.C.S. § 6301(a)(1)(ii), and furnishing alcohol to a

minor, 18 Pa.C.S. § 6310.1(a).  Appellant raises various issues on appeal,

including challenges to the weight and sufficiency of the evidence, and the

discretionary aspects of his sentence.  After careful review, we affirm.

Appellant was convicted of the above-stated offenses based on evidence

that he and his wife sexually abused a minor, female victim over the course

_____

* Former Justice specially assigned to the Superior Court.

of several months.[1]  More specifically, Appellant, who was a former substitute teacher at the victim's high school, began a sexual relationship with the victim during her sophomore year in high school.  The victim testified that Appellant's wife, who was also a teacher and the band director at the school, knew about the victim's sexual relationship with Appellant and, on one occasion, participated with the victim in performing oral sex on Appellant.  The victim testified that she regularly stayed overnight at Appellant's home, sometimes sleeping in the bed between him and his wife.  The relationship culminated with Appellant, his wife, and the victim getting matching wrist tattoos.  Ultimately, the victim told her psychologist about the relationship, who then reported it to authorities.

Appellant and his wife were arrested and charged with various offenses.  They were tried as co-defendants before a jury in June of 2019.  After a three-day trial, the jury convicted Appellant of the above-stated crimes, and his wife of similar offenses.  Appellant was sentenced on January 14, 2020, to the aggregate term set forth *supra*.  He filed a timely post-sentence motion, which was not ruled on by the court within the requisite 120 days.  **See** Pa.R.Crim.P. 720(B)(3)(a).  Consequently, Appellant preaciped the clerk of courts to enter an order denying his post-sentence motion by operation of law pursuant to Pa.R.Crim.P. 720(B)(3)(c).  Instead of the clerk of courts doing so, however,

---

[1] Appellant's wife was his co-defendant at trial, and her appeal from the judgment of sentence imposed after she was convicted is before this Court at docket number 893 MDA 2020.

- 2 -

the trial court entered an order on June 25, 2020, denying Appellant's post-sentence motion.

Appellant then filed a notice of appeal on June 30, 2020.[2,3]  Appellant also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  The court filed its Rule 1925(a) opinion on October 7, 2021.  Herein, Appellant states the following issues for our review:

## A. Weight of the Evidence

i. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when presented with the following regarding the weight of the evidence: that the jury's determination that Appellant committed the crime of institutional sexual assault, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting

---

[2] Appellant incorrectly stated in his notice of appeal that he is appealing from the June 25, 2020 order denying his post-sentence motion.  An appeal properly lies from the judgment of sentence.  ***See Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*).  We have corrected the caption accordingly.

[3] Because the clerk of courts never entered an order denying Appellant's post-sentence motion by operation of law, and the court's order was entered outside the 120-day period, Appellant's June 30, 2020 notice of appeal could be considered untimely.  However, this Court has held that a breakdown in the operations of the court occurs when the clerk of courts fails to enter an order deeming a post-sentence motion denied by operation of law as required by Rule 720(B)(3)(c).  ***See Commonwealth v. Patterson***, 940 A.2d 493, 498-99 (Pa. Super. 2007) (citation omitted).  Accordingly, we decline to quash this appeal.

sexual activity, and both [A]ppellant and his co-defendant denied said sexual activity?

ii. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when presented with the following regarding the weight of the evidence: that the jury's determination that Appellant engaged in a course of conduct that violated a duty of care to the victim, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that Appellant repeatedly encouraged [the] alleged victim to seek psychiatric help, repeatedly consulted with the alleged victim's parents regarding her mental health, took steps to check on the health and well-being of the alleged victim, and the fact that although there were thousands of contacts between Appellant and the alleged victim, none were shown to have placed her in danger, or were shown to have either established a duty of care or that duty of care was violated?

iii. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgement [sic] of Acquittal when presented with the following regarding the weight of the evidence: whether the jury's determination that Appellant corrupted the morals of a minor by committing the crime of institutional sexual assault, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no physical or corroborative evidence of sexual activity, [and] no digital evidence suggesting sexual activity?

iv. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when presented with the following regarding the weight of the evidence: that the jury's determination that Appellant furnished alcohol to a minor, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no evidence of the alleged victim being under the influence of alcohol, or testimony as to the effects of the purported alcohol on the alleged victim such that one could infer her ingestion of an actual alcoholic substance?

**B. Sufficiency of Evidence**

i. Whether the adjudication of guilt for endangering the welfare of [a] child[] is based upon insufficient evidence where the Commonwealth failed to prove beyond a reasonable doubt that there existed a duty of care and support for the alleged victim and/or that the duty of care and support was violated?

ii. Whether the adjudication of guilt for furnishing alcohol to minors is based on insufficient evidence where the Commonwealth failed to establish by either direct or circumstantial evidence that … any alcohol was provided to a minor in that there was no testing of the purported alcoholic substance, there was no testimony of impact suffered as a result of substance, nor any testimony regarding the minor's prior experience or knowledge of effects?

**C. Denial of pre-trial Motion for Review of Psychological Records**

Whether the trial court erred as a matter of law in denying Appellant's request that an in-camera review of [the victim's] psychological records be conducted, when there was no showing that the entirety of the requested materials would be covered … pursuant to 42 Pa.C.S.[] § 5944 and Appellant was therefore denied full and fair cross-examination?

**D. Denial of Request for Mistrial following Pedophile Comments in Closing**

Whether the trial court erred in refusing to grant [Appellant's] request for a mistrial, following the prosecutor twice referring to … Appellant and his co-defendant as "pedophiles" during closing arguments; thereby prejudicing the jury in such a manner as it was impossible for jury people to render a fair and impartial verdict?

**E. Sentencing issues**

i. Whether the trial court erred in sentencing Appellant in the aggravated range and failed to state sufficient reasons for and/or relied on factors contemplated by the statute?

ii. Whether the trial court abused its discretion in failing to consider the history, character, and condition of … Appellant

and imposing a sentence that was not individualized to Appellant and was excessive?

Appellant's Brief at 8-11 (some unnecessary capitalization omitted).

In assessing Appellant's issues, we have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have examined the well-reasoned opinion of the Honorable Michael J. Barrasse of the Court of Common Pleas of Lackawanna County. We conclude that Judge Barrasse's 63-page, comprehensive opinion accurately disposes of the issues presented by Appellant. Accordingly, we adopt Judge Barrasse's opinion as our own and affirm Appellant's judgment of sentence for the reasons set forth therein.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/09/2022

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE COURT OF COMMON PLEAS OF LACKAWANNA COUNTY |
| v. | CRIMINAL DIVISION |
| NICODEMA BAGGETTA | 18 CR 1287 |

## OPINION

### BARRASSE, J.

This opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure and pursuant to the request of the Superior Court. The Appellant's issues for appeal are as follows:

1. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Institutional Sexual Assault when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity?

2. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Endangering Welfare of Children, finding a "course of conduct," when the Defendant repeatedly encouraged alleged victim to seek psychiatric help, repeatedly consulted with the alleged victim's parents regarding her mental health, took steps to check on the health and well-being of the alleged victim, and the fact that although there were thousands of contacts between Defendant and the alleged victim, none were shown to have placed her in danger, or were shown to have either established a duty of care or that a duty of care was violated?

3. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Corruption of Minors, finding a violation of a sexual offense under the crimes code when there was no physical or corroborative evidence

of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied sexual activity?

4. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Furnishing Alcohol to a Minor, when there was no evidence of the alleged victim being under the influence of alcohol or testimony as to the effects of the purported alcohol on the alleged victim such that one could infer her ingestion of an actual alcoholic substance?

5. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Endangering of Welfare of Children when the Commonwealth failed to present evidence establishing that there existed a duty of care and support for the alleged victim and/or that the duty of care and support was in any way violated?

6. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Furnishing Alcohol to a Minor when the Commonwealth failed to present sufficient evidence that an actual alcoholic beverage was furnished to a minor in that there was no testimony regarding victim's knowledge of or prior experience with alcoholic beverages, or testimony regarding any impact suffered as a result of ingesting the purported "alcoholic" beverage?

7. Whether the trial court erred in failing to grant Defendant's pretrial motion for examination or in camera examination of the alleged victim's psychological records when the mental health of the victim was at issue in the trial, the records could have supported elements of Defendant's defense, and when there would have been no harm to the victim, as the defense sought an in camera review, and that any perceived harm to the victim would be substantially outweighed by the harm posed to the Defendant in not disclosing said records resulting in the abrogation of the Defendant's Sixth Amendment confrontation rights under both the United States and the Pennsylvania constitutions?

8. Whether the trial court erred in refusing to grant Defendant's request for a mistrial, following the prosecutor twice referring to the Defendant as a "pedophile," during close arguments prejudicing the jury so as to render a fair and impartial verdict?

9. Whether the trial court erred in imposing a sentenced and/or erred in failing to modify its sentenced pursuant to Defendant's Post-Sentence Motions, when the sentence was in the aggravated range of the Pennsylvania sentencing guidelines and

2

the court failed to state sufficient reasons and/or relied on inappropriate and/or factors already contemplated by the statute under which Defendant was convicted?

10. Whether the trial court abused its discretion in the imposition of a sentence of 4 ½ -9 years' total confinement, which is in the aggravated range of the applicable Guidelines, in that it was not "necessary" to address the "nature and circumstances of the crime" in light of the history, character and condition of the Defendant and was not "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community and rehabilitative needs of the defendant?"

11. Whether the trial court erred regarding the sentencing of the Endangering the Welfare of Children count as a third degree felony, when the Criminal Information failed to allege a "course of conduct" required for the enhanced grading, regardless of the specific question posed to the jury on the verdict slip?

12. Whether the trial court erred in denying Defendant's Motion for Bail Pending Appeal when there was already a significant amount of time in jail served, and Defendant presents no threat to the community and/or victim, has both family and community support, presents no flight risk, as evidenced by the fact that while previously on bail he appeared for all required court appearances and committed no bail violations and desires to both begin the process of rebuilding his life and actively participate in the preparation of her appeal?

## FACTUAL AND PROCEDURAL HISTORY

Appellant, Nicodemo Baggetta, former substitute teacher at Lakeland High School and husband of Ruth A. Baggetta, band director at Lakeland High School in Scott Township, Pennsylvania became the focus of an investigation conducted by the Lackawanna County District Attorney's Office "Special Victim's Unit,"[1] when eighteen (18) year old ███████ Victim disclosed incidences of abuse to her counselor. Being a mandated reporter, the counselor referred the incidences of abuse to ChildLine.[2] Upon receipt of the ChildLine referral and report, Lakeland School District resource officer Frank Rapoch of the Scott Township Police Department contacted Detective Michelle Mancuso of the Lackawanna County District

---

[1] The "Special Victim's Unit" investigates crimes against children, including physical and sexual abuse against children.
[2] ChildLine is a child abuse hotline that provides a means for mandated reporters to report child abuse in Pennsylvania.

Attorney's Office, "Special Victim's Unit." Detective Mancuso extensively interviewed ▓▓▓ [Victim]

who provided detailed descriptions beginning in 2015 through 2018 of a manipulative and

intimate sexual relationship involving the Appellant, and the Appellant's wife, Ruth A. Baggetta,

her band teacher.[3] As a result of the investigation, on March 29, 2018, through Criminal

Information, the Commonwealth charged the Appellant with the following offenses: one (1)

count of Institutional Sexual Assault, **18 Pa. C. S. §3124.2**; one (1) count of Endangering the

Welfare of Children- Parent/Guardian, **18 Pa. C.S. §4304(a)(1)**; one (1) count of Corruption of

Minors- Defendant age 18 or above, **18 Pa C.S. §6301(a)(1)(ii)**; and one (1) count of Furnish

Liquor or Malt Beverage to a Minor, **18 Pa. C.S. §6310.1(a)**. On June 10, 2019, the

Commonwealth amended the Criminal Information to the following offenses: School-

Intercourse/Sexual Contact with Student, **18 Pa. C.S. §3124.2 (a.2)(1)**; Endangering the Welfare

of Children- Parent/Guardian, **18 Pa. C.S. §4304(a)(1)**; one (1) count of Corruption of Minors-

Defendant age 18 or above, **18 Pa C.S. §6301(a)(1)(ii)**; and one (1) count of Furnish Liquor or

Malt Beverage to a Minor, **18 Pa. C.S. §6310.1(a)**.

Subsequently, the Appellant proceeded to a three (3) day jury trial[4] on each of the above-

cited offenses. (**Notes to Testimony hereinafter, "N.T." June 17, 2019- June 19, 2019**).

During trial, the Commonwealth presented five (5) witnesses and admitted multiple exhibits,

including a voluminous Pen-Link database report documenting text and call frequencies and

times between ▓▓▓ [Victim] and the Appellant, and ▓▓▓ [Victim] and the Appellant's wife, Ruth Baggetta. At

the conclusion of the Commonwealth's evidence, counsel for the Appellant made an oral motion

---

[3] The Commonwealth also charged Ruth A. Baggetta with the following offenses: School-Intercourse/Sexual Contact with Student, 18 Pa. C.S. §3124.2(a.2)(1); Endangering Welfare of Children- Parent/Guardian, 18 Pa. C.S. §4304(a)(1); Corruption of Minors- Defendant age 18 or above, 18 Pa. C.S. §6301(a)(1)(ii); Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a); and Failure to Report/Refer, 23 Pa. C.S. §6319(a)(1), (2)(i)(iii). Ruth A Baggetta is the listed Appellant in Commonwealth v. Ruth A. Baggetta, 2020 MDA 893.

[4] This Court granted the Commonwealth's Motion for Joinder and joined for trial the above-captioned Appellant with his wife, Ruth A. Baggetta on November 9, 2018.

4

for judgment of acquittal, which this Court denied. **(N.T. June 18, 2019- p.m. p. 13-14).** The Appellant testified as well as the Appellant's wife, Ruth Baggetta, and four (4) character witnesses testifying jointly as to both the Appellant's character and his wife, Ruth A. Baggetta's character.

Accordingly, after observing all testimonial evidence and exhibits presented, including receiving several instructions provided by this Court, the jury found the Appellant guilty on all four (4) Counts of the Criminal Information. Relative to the grading of the Endangering Welfare of Children offense, the jury found the additional fact that the Appellant engaged in a "course of conduct." Also, relative to the grading of the Corruption of Minors offense, the jury found the additional fact that the Appellant engaged in a "course of conduct." To that end, this Court requested a pre-sentence investigation report (hereinafter "PSI") as well as an assessment by the Pennsylvania Sexual Offenders Assessment Board. In preparation for sentence, this Court thoroughly reviewed the Sentencing Guidelines, as well as the PSI, a Sentencing Memo dated September 27, 2019, the Pennsylvania Sexual Offender's Assessment Board report, including all mitigating and aggravating factors, as well as the victim impact statement, and oral statements by the Appellant and the Appellant's parents, including several letters authored by extended family members and friends. Additionally, this Court carefully considered the Appellant's underlying criminal conduct, manipulation, seriousness, and frequency of the Appellant's offenses, as well as the particularized facts associated with the Appellant's conduct, placing a minor at risk. This Court stated: "you've taken a young woman, who, by everyone's testimony, had mental health issues and emotional issues, and you were able to basically target her, groom her, and abuse her. What you did, and the power that you had, in your position, these vulnerable—All children. It's not just the one. It's all. And she will be scarred [ . . . ] for the rest of her life." **(N.T. January**

5

14, 2020 p. 16-17). Therefore, articulating the following aggravating factors: "based upon the facts, the number of text messages, the length of period of time, and the actions that were committed by you," this Court sentenced in the aggravated range on three offenses[5] for an aggregate sentence of fifty four(54) to one hundred and eight (108) months in a state correctional with six (6) years' special probation.[6] Id. at 17.

Subsequently, on January 24, 2020 the Appellant filed a Post-Sentence Motion challenging the weight and sufficiency of the evidence, evidentiary rulings, and discretionary aspects of sentencing. The Appellant requested a reduced sentence, visitation with his child, and bail pending appeal. This Court held a hearing on the Appellant's Post-Sentence Motions on March 10, 2020. Subsequently, this Court denied the Appellant's Post- Sentence Motion on June 25, 2020, and the Appellant timely filed a Notice of Appeal to the Pennsylvania Superior Court.

## DISCUSSION

1. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Institutional Sexual Assault when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity?**

2. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Endangering Welfare of Children, finding a "course of conduct," when the Defendant repeatedly encouraged alleged victim to seek psychiatric help, repeatedly consulted with the alleged victim's parents regarding her mental health, took steps to check on the health and well-being of the alleged victim, and the fact that although there were thousands of contacts between Defendant and the alleged victim, none were shown to have placed her in danger, or**

---

[5] Institutional Sexual Assault, 18 Pa. C. S. §3124.2; Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. §4304(a)(1); and Corruption of Minors- Defendant age 18 or above, 18 Pa C.S. §6301(a)(1)(ii).
[6] Relative to the offense of Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a), this Court sentenced the Appellant within the statutory maximum to one (1) year probation consecutive to Count I.

6

were shown to have either established a duty of care or that a duty of care was violated?

3. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Corruption of Minors, finding a violation of a sexual offense under the crimes code when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied sexual activity?

4. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Furnishing Alcohol to a Minor, when there was no evidence of the alleged victim being under the influence of alcohol or testimony as to the effects of the purported alcohol on the alleged victim such that one could infer her ingestion of an actual alcoholic substance?

The Appellant's claims one (1) – four (4) challenge the weight of the evidence and have been consolidated herein, by this Court. The weight of the evidence supports the jury's verdict as to all offenses charged, including the additional "course of conduct," factors that impact offense grading. See Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa. Super. 2012)(quoting Commonwealth v. Diggs, 949 A.2d 873, 880 (Pa. 2008)("[A] trial court's denial of a post-sentence motion 'based on a weight of the evidence claim is the least assailable of its rulings.").

The determination of whether to grant a new trial because the verdict is against the weight of the evidence rests with the discretion of the trial court and will not be disturbed unless the trial court has abused its discretion. Commonwealth v. Pronkoskie, 445 A.2d 1203, 1206 (Pa. 1982). A claim that the evidence presented at trial was contradictory and unable to support the verdict requires the grant of a new trial only when the verdict is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Saksek, 522 A.2d 70, 72 (Pa. Super. 1987). Moreover, the weight to be accorded conflicting evidence is exclusively for the fact finder,

7

whose findings will not be disturbed on appeal if they are supported by the record. Commonwealth v. Zapata, 290 A.2d 114, 117 (Pa. 1972); See also Commonwealth v. Hamilton, 546 A.2d 90, 95-96 (Pa. Super. 1988), allocator denied, 558 A.2d 531 (1989)(holding that the scope of review for a claim that a verdict is against the weight of the evidence is very narrow, especially where issues of credibility are concerned, it is not the function of the appellate court to substitute its judgments based on a cold record for that of the trial court); Commonwealth v. Champney, 832 A.2d 402, 408 (Pa. 2003)(the weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses [ . . . ] an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim); Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa. Super. 2012)("A jury decision to credit certain evidence and reject other testimony is appropriate; therefore, the trial court did not abuse its discretion in concluding that its sense of justice was not shocked by the verdict.").

Applying the above standards to the instant case, the Appellant's guilty verdict does not shock one's sense of justice such that it is against the weight of the evidence. The record supports the jury's finding of guilt, including the additional "course of conduct" factor. In this case, the Commonwealth presented five (5) witnesses, including the victim. At trial, the jury heard detailed, and traumatizing testimony from ████████ the victim, who revealed an inappropriate, manipulative, abusive, and intimate sexual relationship with the Appellant, and his wife, Ruth A. Baggetta, her teacher and band instructor fueled by vulnerabilities and positions, corroborated by twelve thousand (12,000) phone contacts via text or call over five (5) months,

8

and ultimately, matching tattoos.

Victim
**[Joelle]** testified that during her sophomore year at Lakeland High School, in the spring of 2016, she assisted with the school's production of "Annie" as a member of the lighting crew. (Notes to Testimony, June 17, 2019 p. 28, 66). **[Victim Joelle]** recalled knowing the Appellant as a substitute teacher, who assisted with the play's production. **Id.** at 29-30, 66. She testified that during this time, her relationship with the Appellant developed. **Id.** at 31. She stated: "Throughout the Annie play I started talking to Nick more outside of school usually through Snapchat." **Id.** at 31, 67. At the same time, **[Victim]**, described a "hectic," home life with her parents, who decided to divorce. **Id.** **[Victim Joelle]** testified that she communicated privately with the Appellant through talking and texting on his cellphone and through Facebook messenger. **Id.** at 32, 70. **[Victim]** noted: "the more personal things that we talked about were usually through Snapchat." **Id.** at 33. Notwithstanding, **[Victim]** indicated that the private texting increased in frequency when the Appellant coaxed her into breaking- up with her boyfriend. **Id.** at 33-34, 42-43. **[Victim Joelle]** testified: "the day that we – that I broke up with Pete, I have been in contact with [Nick] for pretty much that whole day. And he kind of walked me through breaking up with him, kind of telling me that it was my chance to do it, and that, like, I shouldn't stay with him." **Id.** at 33. The Appellant expressed that "nobody was going to be able to treat **[Victim]** better than he would." **Id.** at 43.

By the play's conclusion, **[Victim]** testified that she had dinner with the Appellant and his wife, and while only sixteen (16) years old, the Appellant suggested that **[Victim]** be their wedding photographer, among other things. **Id.** at 35-36, 74. Shortly thereafter, the Appellant and his wife would randomly visit **[Victim]** at her jobs. She stated: "I do know that they did visit me at pretty much every job that I had." **Id.** at 38. Indeed, **[Victim]** recalled a time when the Appellant

9

appeared alone, and she showed the Appellant around her job site. **Id. at 39**. The Appellant waited until Victim's shift concluded and invited her to his wife's apartment. Upon arrival, Victim described that the Appellant's wife appeared unaware and "surprised," by Victim's presence. **Id. at 40**. The Appellant continued to invite Victim to his wife's apartment, including occasions in his wife's absence since the Appellant lived with his parents. Eventually, the Appellant invited Victim to the couple's house. **Id. at 38, 41**. Victim testified: "I mean, once I started seeing them outside of school it was probably weekly that I was there or that we went to dinner or that I saw them outside school." **Id. at 41**.

At the same time, Victim recalled that the Appellant began to privately communicate with her often. She noted that the Appellant privately communicated with her "pretty much around the clock. It didn't really matter what time of day that it was." **Id. at 42**. From these communications, Victim believed that the Appellant held "some sort of feelings towards [her]." **Id. at 43**. Victim explained that the Appellant admitted he discussed his "feelings" towards her with his wife, her teacher and band instructor. The Appellant reiterated to Victim that his wife recommended him and Victim "act on those feelings so to kind of sweep them under the rug [ . . .] kind of kiss and get over it." **Id. at 43-44**.

To that end, the Appellant began a sexual relationship with Victim for approximately two (2) years. The sexual relationship initiated with "sexual" Snapchats from the Appellant, who directed Victim to delete the chats. **Id. at 67; (N.T. June 18, 2019 a.m. p. 6)**. Victim testified: "he didn't want anybody to know about what was going on in the Snapchats [ . . . ] like anything we talked about regarding anything sexual." **Id. at 6**. She explained: "Nick was always prompt about making sure that I didn't save anything." **N.T. June 17, 2019 p. 68**.

Victim testified that the relationship became physical in May 2016, when she arrived at

10

the Appellant's wife's apartment to find the Appellant alone. He began kissing her, pulling down her pants and touching the outside of her vagina. **Id.** at 44-45. ██████ explained that the kissing and touching started on the couch and then progressed to a spare bedroom. **Id.** at 45. At the end of the evening, the Appellant's wife returned to her apartment. ██████ explained: "once, I was there Ruth had kind of said that there was not to be anything more than kissing. So when that was happening Nick was kind of like, well, why should there be boundaries on emotions or feelings [ . . . ] why don't you let me, [ . . . ] make you feel better." **Id.** at 45.

Subsequently, ██████ testified to at least ten (10) additional sexual incidences with the Appellant, including digital penetration, performing oral sex on the Appellant, receiving oral sex from the Appellant, and engaging in anal sex with the Appellant. **Id.** at 46-50, 78. She described the first occasion when oral sex occurred. ██████ testified: "I was sitting on one of the couches and Nick was sitting on another couch [ . . . ] and then he was kind of like, Why are you sitting on that couch when you can come over and sit here with me? And then it was kind of, like, you know, you shouldn't be wearing pants [ . . . ] that day he also touched me, and then I did oral on him that day." **Id.** at 47. Similarly, ██████ recalled that the Appellant pressured her into having anal sex stating that "it was something that Ruth wouldn't do with him and that he had never done that with anybody and that I was his last chance [ . . . ] it was a first that he wanted to have with me; and I believed that at the time." **Id.** at 49. Additionally, ██████ recalled that the Appellant's wife also engaged in sexual activity with her, wherein, the Appellant's wife and Joella both performed oral sex on the Appellant. ██████ stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." **Id.** at 50. ██████ testified

11

83. **Victim** explained that she would regularly sleep at the Appellant's house overnight. **Id.** at 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [. . .] I usually would sleep in their bed with them [. . .] there were a few times where I slept in the middle between the two of them." **Id.** at 58. **Victim** also explained that on some occasions, the Appellant groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and his wife. **Id.** at 58-59. **Victim** even discussed moving into the couple's house. **Id.** at 57. She recalled other occasions wherein the Appellant's wife would be downstairs while **Victim** smoked marijuana with the Appellant upstairs. **Id.** at 59. **Victim** noted several occasions when the Appellant provided her with wine or liquor and weed. **Id.** The Appellant also provided her with a vibrator that he utilized on **Victim** when she came to his house. **Id.** at 60. She testified that the vibrator was kept in the Appellant's house "upstairs in one of the bathroom drawers." **Id.** at 60.

Finally, to solidify and symbolize the intimate and sexual relationship that transpired, the couple and **Victim** obtained matching wrist tattoos. **Id.** at 54-57. She described previously researching a particular tattoo with the Appellant and the Appellant's wife, and then traveling to Electric City Tattoo, whereupon they obtained a tattoo with three birds on a branch. **Id.** at 57.

As result of **Victim** disclosures, Detective Michelle Mancuso, employed by the Lackawanna County District Attorney's Special Victims Unit since 2007, conducted interviews with **Victim**. She testified that **Victim** consistently provided the same information during each interview, and that **Victim** reported additional information regarding anal sex with the Appellant as well as a sex toy that the Appellant gifted to **Victim** and "had used on her." (N.T. June 18,

12

2019 a.m. p. 44-45, 83, 102). Detective Mancuso testified that [Victim] and the Appellant frequently communicated via text or Snapchat. **Id.** at 54, 56.

The Commonwealth also produced evidence that [Victim] attended Lakeland High School through her sophomore year, during which the Appellant was employed as a band and drama volunteer. **Id.** at 19-20. Lakeland School District superintendent, William King, testified that as a volunteer, the district required the Appellant to "go through the same process as regularly hired paid employees." **Id.** at 20. Superintendent King further explained: "all employees and volunteers are required to get a child abuse background check, which is Act 151. They're required to get a state police background check, which is Act 34, and they're required to have FBI fingerprint checks [ . . . ] whether you're an employee hired and paid or you're a volunteer [ . . . ] they all have to – they're all required to get the background checks." **Id.** at 21-22. Additionally, Principal of Fell Charter Elementary School, Mary Jo Walsh testified that she personally hired the Appellant as a full-time learning support teacher in the special education department. **Id.** at 26-27, 30. She echoed Superintendent King's testimony, and explained that prior to hiring the Appellant, the school required the Appellant undergo background checks and complete a child abuse history verification. **Id.** She confirmed that the Appellant completed training for mandated reporters regarding child abuse and neglect. **Id.** at 27, 33-34. Hypothetically, Ms. Walsh noted that if she were to become aware of a teacher having any type of inappropriate sexual conduct with a student, she would "absolutely" report the abuse. **Id.** at 39. Similarly, Detective Mancuso testified that anyone under the age of eighteen (18) is considered a child. **Id.** at 43.

Moreover, the Commonwealth also produced extensive evidence corroborating the magnitude of communications between the Appellant and [Victim]. Detective Mancuso testified

13

that she obtained ███████ cellphone number, the Appellant's cellphone number, and the Appellant's wife's cellphone number. **Id. at 46.** Detective Mancuso confirmed the authenticity through the respective cellphone providers. **Id. at 47-48, 50-53.** She related that she obtained a "voluminous" amount of ███████ phone records for the five (5) month period of June 11, 2016 through November 12, 2016. **Id. at 48.** Although unable to retrieve the content of the communications, Detective Mancuso testified that she employed a software program named Pen-Link, which parsed out times, dates, and frequency of communications. **Id. at 53-54, 87.**

Accordingly, Detective Tom Davis employed by the Lackawanna County District Attorney's Office for approximately twenty (20) years and certified in the use of Pen-Link software, testified that he utilized ███████ phone records to create a "frequency hot number list." **Id. at 106.** Detective Davis explained that "frequency" connotates incoming and outgoing calls as well as text messages. **Id.** He further explained how he parsed out the "frequency" into time of day, day of week, and incoming or outgoing calls. **Id. at 117, 119.** Detective Davis noted an inability to examine any content or relevance of the contacts, but just "there was a message sent or received." **(N.T. June 18, 2019 p.m. p. 9,12).**

Detective Davis testified that the frequency between the Appellant and ███████ for the period of June 11, 2016, through November 11, 2016 totaled 12,122 contacts either voice or text. **(N.T. June 18, 2019 a.m. p. 110-111,115).** Detective Davis noted that a contact occurred every day of the week with the most contact occurring on Saturdays and at most frequently at night, "8, 9, 10 p.m." **Id. at 117-118.** He stated: "there are some during every hour of the day. You're starting on the left side, which would be midnight, and goes from one, two, three, four, five, 6 a.m." **Id.**

14

Notwithstanding, the Commonwealth's inability to retrieve the content of the communications, the Appellant provided Detective Mancuso with approximately 2500 pages of text message content between [Victim] and the Appellant, and [Victim] and the Appellant's wife as well as text message content between the Appellant and the current Lakeland High School band director, Bryan Brophy. **Id.** at **59, 61-62, 78.** The text message content reflected a period beginning in 2017 through March 19, 2018, the day before [Victim's] disclosure. **Id.** at **59.** Detective Mancuso explained the Appellant's ability to extract his own cell-phone data versus a cell-phone provider's retention of data. **Id.** at **60.** She explained that [Victim] had no text messages on her phone and at the direction of the Appellant, had deleted all the text messages between her and the Appellant and the Appellant's wife. **Id.** at **79.** She confirmed the accuracy of the content provided by the Appellant, given her review of the conversations that occurred and knowing the characteristics of everyone's life, which she indicated was consistent with [Victim's] testimony. **Id.** at **63, 99, 101.** She also noted that the Appellant invited [Victim] to his house on several occasions, which corroborated [Victim's] disclosures. **Id.** at **66.** The Appellant also told [Victim] "I love you" and recollected "I still see the sixth grader at my school when I student taught." **Id.** at **77, 98.** Ultimately, Detective Mancuso opined: "there were not any mentoring texts that I had seen. Just the contrary. He was very derogatory towards her, very dismissive towards her, at some point calling her pathetic." **Id.** at **66.** To that end, the Commonwealth published a series of text message content reviewed by Detective Mancuso. For example, Detective Mancuso referenced text messages that the Appellant sent to [Victim], which stated:

> No, this is the thing you do. I've notice any time someone has shit going on you need to be involved, like the new girl, like this. Do your own shit, kid, because no one else gives a fuck about you but you and us [ . . . ] I'm telling you the truth and you don't want to hear it because you love to fuck yourself and worry about everyone else [. . . ] Don't want to hear it. You have gotten so close to me in two

15

years, then you're just going to stand around and be sad and not say what's going on, like I'm going to beg you. Get the fuck out of here. You talk to Josephine because she asked you to live with her. Go tell her all your shit. Let her help you out.[7]

**Id. at 69, 75, 92, 94,97.**

Detective Mancuso corroborated the Appellant's decision to obtain matching tattoos. She referenced a text conversation between the Appellant and Victim , wherein the Appellant sends a photograph of the tattoo to Victim , indicating that he likes it best and where the tattoo will be placed, on their wrists. **Id. at 73, 96-97.**

Moreover, Detective Mancuso referenced a text conversation between the Appellant and Mr. Brophy, which occurred on July 17, 2018, wherein the Appellant stated: "even if I did do shit with her, which we all know I didn't, what motherfucker has the right to make a law saying it was wrong [ . . . ] they say the age of consent is 16, but for me it's not because of my profession." **Id. at 65, 89,91.**

Lastly, the Appellant's wife, Ruth Baggetta, and Victim's teacher and band director did not dispute that she initiated communication with Victim through her husband, the Appellant. **(N.T. June 18, 2019 p.m. p. 39, 71).** Mrs. Baggetta testified: "I was talking to her through my husband because I knew he was speaking to her and then yes, I did speak to her." **Id.** Throughout the entirety of Mrs. Baggetta's lengthy testimony, she characterized each response with "we," and "us"[8] indicating that Mrs. Baggetta and the Appellant held mutual conversations

---

[7] The Appellant admitted he sent such text messages verbatim. (N.T. June 19, 2019 p. 28-29).

[8] For example, Mrs. Baggetta testified to generalized statements such as: "Yes, we did. We talked to her parents about it [ . . . ] we did [ . . . ] Yes, because it came out to us that she was having lots of other issues with herself [ . . . ] she would tell us about how she felt about herself and she was not – she did not like herself and she -- we became very concerned [ . . . ] we told her parents so that they would know [ . . . ] it was much more than we could handle [ . . . ] we wanted her to keep telling us so that we could tell her mother [ . . . ] we found out that she was cutting and she wouldn't show us but she had told us [ . . . ] later when she was at our house and she had started doing it again and we told her she needed to start talking to her therapist [ . . . ] we had told her mother so we didn't think we needed to tell anybody else [ . . . ] we would just ask her about what her hobbies were and she told us she liked photography so then we asked her if she had a portfolio and she showed us some stuff on Facebook and we asked

16

and made mutual decisions regarding their interactions, manipulation, and abuse of Victim. **Id.** at **38-48,54-56-66, 80-81**. In fact, Mrs. Baggetta shifted responsibility, feigning ignorance of all mandated reporter policy, and testified that her and the Appellant did not refer Victim's issues to ChildLine or guidance counselors because "we told her parents." **Id.** at **80**.

Mrs. Baggetta also corroborated that the Appellant visited Victim at her employment, without her, and afterwards had invited Victim to their residence to sleep over. **Id.** at **52, 72-73**. On another occasion, Mrs. Baggetta testified that Victim stayed at their residence, while the couple vacationed for their honeymoon. **Id.** at **54**. Further, Mrs. Baggetta testified that they all stayed together overnight at the residence in November 2016 and "a few more times," approximately "a dozen." **Id.** at **56, 59, 62, 73**. Importantly, Mrs. Baggetta did not dispute that the Appellant volunteered at Lakeland High School, especially in the production of "Annie," and interacted with Victim during that production. **Id.** at **69-70**. Nor did Mrs. Baggetta dispute that "constant" communication "around the clock or all the time," occurred among them, and would be atypical for other students. **Id.** at **71-72**. Finally, Mrs. Baggetta did not dispute that they all received "matching tattoos." **Id.** at **74**.

Lastly, the Appellant testified that he substituted day- to- day at Lakeland High School in 2012 and long-term in 2014 until 2016. **Id.** at **114-115**. He admitted to "always," being involved at Lakeland, despite his employment at Fell Charter. **Id.** at **118**. Specifically, the Appellant testified that he assisted with the drama club as a pseudo "stage manager," for the production of "Annie." **Id.** at **119**. At this time, the Appellant testified he met Victim,[9] however

---

her to take our engagement pictures [ . . .] we had offered to buy that lens for her to take our pictures [ . . . ] we were close with her because we had been talking to her making sure she was okay so she helped us to move into the house when we were moving all of our stuff [ . . . ] when she stayed over we would be watching TV, we would play games, we would feed her dinner [ . . . ] we saw her again in February." (N.T. June 18, 2019 p.m. p. 39, 40, 42, 43, 44, 45, 47, 54, 56-61, 63-66, 80-81).

[9] Contrastingly, throughout the Appellant's testimony, the Appellant testified in generalized statements of "I." For example, "I was very surprised because I had known her so little so it was kind of strange for someone that I had

17

the Appellant admitted he did "see" her before as a substitute teacher but did not "know" her. **Id.** at 119-120. The Appellant shifted responsibility on [Victim] and testified that [Victim] initiated contact by untying his shoe to be funny. **Id.** at 120. He testified that their communications increased at the conclusion of "Annie," via text messages "non-stop," and at the direction of [Victim], who created his Snapchat. **Id.** at 122-124, 126, 130. Although, he conceded that he often instructed [Victim] in text messages to "check her Snap." (N.T. June 19, 2019 p. 8).

The Appellant also testified that he visited [Victim] several times at her employment. **Id.** at 129. On one occasion, the Appellant testified that he confronted [Victim's] manager at JCPenney's for "the way he had looked at her and some of the things that he had said to her." **Id.** at 144. The Appellant testified that of his own accord, he went to JCPenney's and pretended to be [Victim's] brother. He stated: "I told the manager if you make my sister feel uncomfortable then the next time that I come back it's going to be with the police." **Id.** at 144-145.

He also testified to occasions where [Victim] "stayed," at his residence "several times," and occasions where he drove [Victim] around. The Appellant admitted he texted [Victim]: "You should visit today, Shh." **Id.** at 131, 133,142-143; N.T. June 19, 2019 p. 16-17, 27. The Appellant corroborated that he employed [Victim] to photograph his engagement as well as stay at his residence during his honeymoon, and help move into his new residence. **Id.** at 138-141. He testified that he often spoke negatively about [Victim's] father, and agreed he commented to [Victim] that: "Doug Leader [ . . . ] only cares about himself and having a place to stick his dick." (N.T. June 19, 2019 p. 29-30). Finally, the Appellant testified that [Victim] initiated the "matching

---

very little contact with to just begin opening up [ . . . ] I was telling her that she was struggling with self-image issues [ . . . ] I was very concerned about some of the stuff that she was saying [ . . . ] it finally got to the point where it was way too much for me to handle [ . . . ] I told her that I would always be there for her, she could always open up to me and I would always be willing to listen to her [ . . . ] it was just wearing on me emotionally to the point where I wasn't sleeping [ . . . ] I would try to reach out because those were the days that I was most concerned [ . . . ] I would mostly start conversations if I had not heard from her all day just to check in [ . . . ] I was very upset for her [ . . . ] we ended the night civilly, but I felt like there was no chance at having the relationship that I believed we could at one point." (N.T. June 18, 2019 p.m. p. 121-124, 127-128, 130, 141, 145, 147).

18

tattoos," without her parents' knowledge. **Id.** at 151. Later, on cross-examination, the Appellant conceded that he planned the tattoo, and that he sent the photograph of the "matching tattoo," indicating that he "liked it best." **(N.T. June 19, 2019 p. 34-35).** The Appellant did not dispute that he characterized his interactions with [Victim] as "our relationship" nor did he dispute that he "looks out for the problem students," and that he "loved" [Victim]. **(N.T. June 19, 2019 p. 5-7, 36).** He acknowledged prior experience with ChildLine and child abuse trainings that discouraged private interactions with students as well as private communications with students. **Id.** at 12, 36. He admitted that a teacher should not be alone with a student. **Id.** Also, the Appellant testified that he did not contact Lakeland School District, or Commonwealth Connections, or any administrative staff to voice his concerns about [Victim]. **Id.** 18-19. The Appellant also did not dispute that approximately 12,000 frequency contacts(equals 80 phone contacts per day) occurred with [Victim], and that he initiated innumerable visits with [Victim] and a dozen overnights, even showering at his residence. **Id.** at 21, 24-25, 39.

Nevertheless, the Appellant challenges the weight of the evidence by arguing that there is no physical or corroborative evidence of sexual activity regarding Count I, Intercourse/Sexual Contact with Student, 18 Pa. C.S. §3124.2 (a.2)(1). Upon review, this Court found the victim['s] [Victim's] testimony to be credible, and reliable enough for the jury to return a verdict of guilty on Count I. As within its province, the jury believed that the Appellant and [Victim] engaged in oral sex, digital penetration, anal sex, and utilized a vibrator on [Victim], as well as simultaneous oral sex on his penis with the Appellant's wife, during a time in which [Victim] was a student and the Appellant volunteered at Lakeland. The jury heard Detectives Mancuso and Davis testify about the frequency of contact between the Appellant and [Victim], approximately 12,000 contacts within a five (5) month period. In fact, the Appellant testified that knowing [Victim] was only sixteen

19

(16), he told Victim he loved her, he visited Victim at work, drove her around, invited her to stay overnight at his residence, invited her to "hang" at his residence on numerous occasions. The Appellant isolated Victim from her family and coaxed her into a sexual relationship, reiterating to Victim that no one else cared about her. The jury was well aware of the unusual circumstances and inappropriate grooming behaviors initiated towards a minor student, i.e. Victim. The Appellant admitted to purchasing a camera lens as a gift, dinners, invitations to "hang out," approximately a dozen or more sleepovers, obtaining matching tattoos, visits to Victim's job, confrontations with her manager, exchanging Christmas gifts with Victim. The jurors listened to the Appellant tell them that he did not notify administration, nor refer Victim to the guidance counselor despite being concerned about Victim's mental health or suicidal ideations throughout a two (2) year period. While the Appellant's wife testified that the couple voiced their concerns about Victim to her parents, the Appellant testified to a soured and strained relationship between him and Victim's parents.[10] (N.T. June 18, 2019 p.m. p. 142,146-148). The Appellant engaged in derogatory commentary about Victim's parents to the point where Victim believed that in the Appellant's words: "the only two people that were ever there for her were my wife and myself." (N.T. June 19, 2019 p. 29-31, 43-44).

A such, the jury was well within its province to decide how much weight to give all the evidence presented at trial. Conflicts between the testimonies of the victim and the Appellant are for the jury to resolve and not for the trial court to undertake. A new trial should not be granted because of a mere conflict in the testimony. **Commonwealth v Widmer**, 744 A.2d 745, 751-52 (Pa. 2000). The jury weighed the evidence presented, evaluated the testimony of the victim and the witnesses, and made a determination thereupon. It was entitled to believe the

---

[10] The Appellant explained that Victim would have arguments with her mother about him. He stated: "Mom did not wish to talk to me and she was basically condemning me." (N.T. June 19, 2019 p. 43). The Appellant also testified that he banned Victim from his residence after arguing with Victim's father. **Id.** at 26.

20

victim and to find the Appellant incredible. Although the Appellant's version of events denies sexual activity, the jury found [Victim] and her testimony credible and discredited that of the Appellant's and his wife. While the Appellant denied a sexual relationship with [Victim], his testimony does not require the conclusion that the Appellant and [Victim] did not engage in oral sex, digital penetration, anal sex, use of a vibrator, or simultaneous oral sex on his penis with his wife. The frequency of private contact, the content of the text messages, and the numerous occasions in which the Appellant and [Victim] were intimately together and intimately together in the Appellant's wife presence as well as the Appellant's wife's blatant motive and biased testimony to protect her husband, led the jury to believe otherwise.

Finally, the lack of corroborating physical evidence does not undermine [Victim's] testimony, found to be credible by the jury. [Victim] testified in detail to at least ten (10) additional sexual incidences with the Appellant, including digital penetration, performing oral sex on the Appellant, receiving oral sex from the Appellant, and engaging in anal sex with the Appellant. (N.T. June 17, 2019 p.m. p. 46-50, 78). She described the first occasion when oral sex occurred. [Victim] testified: "I was sitting on one of the couches and Nick was sitting on another couch [ . . . ] and then he was kind of like, Why are you sitting on that couch when you can come over and sit here with me? And then it was kind of, like, you know, you shouldn't be wearing pants [ . . . ] that day he also touched me, and then I did oral on him that day." Id. at 47. Similarly, [Victim] recalled that the Appellant pressured her into having anal sex stating that "it was something that Ruth wouldn't do with him and that he had never done that with anybody and that I was his last chance [ . . . ] it was a first that he wanted to have with me; and I believed that at the time." Id. at 49. Additionally, [Victim] recalled that the Appellant's wife also engaged in sexual activity with her, wherein, the Appellant's wife and [Victim] both performed oral sex on the

21

Appellant. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." **Id.** at 50. [Victim] testified that she and the Appellant's wife simultaneously performed oral sex on the Appellant. **Id.** at 51, 83. [Victim] explained that she would regularly sleep at the Appellant's house overnight. **Id.** at 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [ . . . ] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." **Id.** at 58. [Victim] also explained that on some occasions, the Appellant groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and his wife. **Id.** at 58-59. [Victim] even discussed moving into the couple's house. **Id.** at 57. She recalled other occasions wherein the Appellant's wife would be downstairs while [Victim] smoked marijuana with the Appellant upstairs. **Id.** at 59. [Victim] noted several occasions when the Appellant provided her with wine or liquor and weed. **Id.** The Appellant also provided her with a vibrator that he utilized on [Victim] when she came to his house. **Id.** at 60. She testified that the vibrator was kept in the Appellant's house "upstairs in one of the bathroom drawers." **Id.** at 60.

Indeed, Pennsylvania courts have "long-recognized that the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." **Commonwealth v. Charlton**, 902 A.2d 554, 562 (Pa. Super. 2006). The jury credited [Victim's] testimony as truthful and did not believe the Appellant's claim that the allegations against the Appellant and the Appellant's wife were

22

fabricated. See **Commonwealth v. Small**, 741 A.2d 666, 672 (Pa. 1999)(Notably, the jury as the fact finder "is free to believe all, part or none of the evidence and to determine the credibility of [the] witnesses."). Also, medical evidence is not required if the fact finder believes the victim. **Commonwealth v. Jette**, 818 A.2d 533, 534 (Pa. Super. 2003) *citing* **Commonwealth v. Owens**, 549 A.2d 129, 133 (Pa. Super. 1994); **Commonwealth v. Castelhun**, 889 A.2d 1228, 1232 (Pa. Super. 2005).

This Court did not abuse its discretion by denying the Appellant's Post–Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding Count I.

Similarly, the Appellant challenges the weight of the evidence regarding Count II- Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. § 4034(a)(1), by arguing that the Appellant's actions were proactive and did not place ~~Victim~~ in danger or violate a duty of care as no duty of care existed. This Court is unconvinced by the Appellant's argument, which is based upon the Appellant's testimony that he directed ~~Victim~~ to seek counseling. This is outside the purview of this Court as the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Here, the fact finder was free to believe the testimony of ~~Victim~~, who recalled that the Appellant began to privately communicate with her often. She noted that the Appellant privately communicated with her "pretty much around the clock. It didn't really matter what time of day that it was." (N.T. June 17, 2019 p.m. p. 42). From these communications, ~~Victim~~ believed that the Appellant held "some sort of feelings towards [her]." **Id.** at 43. ~~Victim~~ explained that the Appellant admitted he discussed his "feelings" towards her with his wife, her teacher and band instructor. The Appellant reiterated to ~~Victim~~ that his wife recommended him and ~~Victim~~ "act on those feelings so to kind of sweep them under the rug [ . . .] kind of kiss and get over it." **Id.** at 43-44. Subsequently, ~~Victim~~ testified that she began a sexual

23

relationship with the Appellant for approximately two (2) years. The sexual relationship initiated with "sexual" Snapchats from the Appellant, who directed [Victim] to delete the chats. **Id.** at 67; **(N.T. June 18, 2019 a.m. p. 6).** [Victim] testified: "he didn't want anybody to know about what was going on in the Snapchats [ . . . ] like anything we talked about regarding anything sexual." **Id.** at 6. She explained: "Nick was always prompt about making sure that I didn't save anything." **N.T. June 17, 2019 p. 68.** [Victim] testified that the relationship became physical in May 2016, when she arrived at the Appellant's wife's apartment to find the Appellant alone. He began kissing her, pulling down her pants and touching the outside of her vagina. **Id.** at 44-45. [Victim] explained that the kissing and touching started on the couch and then progressed to a spare bedroom. **Id.** at 45. [Victim] explained: "once, I was there Ruth had kind of said that there was not to be anything more than kissing. So when that was happening Nick was kind of like, well, why should there be boundaries on emotions or feelings [ . . . ] why don't you let me, [ . . . ] make you feel better." **Id.** at 45. Subsequently, [Victim] testified to at least ten (10) additional sexual incidences with the Appellant, including performing oral sex on the Appellant, receiving oral sex from the Appellant, and engaging in anal sex with the Appellant as well as use of a vibrator on her. **Id.** at 46-50, 78. On one occasion, [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." **Id.** at 50. [Victim] testified that she and the Appellant simultaneously performed oral sex on the Appellant's husband. **Id.** at 51, 83. [Victim] further explained she saw the Appellant weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often and initiated visits. The Appellant even allowed [Victim] to shower at the house. **Id.** at 41,

24

51, 75. **Victim** stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [. . .] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." **Id**. at 58. **Victim** also explained that on some occasions, the Appellant's groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and his wife. **Id**. at 58-59.

Comparingly, the jurors listened to the Appellant tell them that he did not notify administration, nor refer **Victim** to the guidance counselor despite being concerned about **Victim's** mental health or suicidal ideations throughout a two (2) year period. (N.T. June 19, 2019 p. 18-19). Moreover, while the Appellant threatened to cease communications with **Victim** if she did not seek therapy and testified to ensuring **Victim** had "constant contact" with her therapist, at no time did the Appellant testify that he notified **Victim's** therapist of suicidal ideations, cutting, or the "dark things" **Victim** was saying about herself to him. (N.T. June 18, 2019 p.m. p. 124,127-128). Instead, the Appellant's testimony reveals that he withheld this information and spoke derogatively of **Victim's** family to her. In addition, the jury implicitly found that the Appellant provided control and supervision of **Victim** assuming such a status relationship to **Victim** so as to impose a duty to act. The Appellant admitted that **Victim** would "hang" at his residence, that she stayed overnight on several occasions, that he drove **Victim** around, provided her dinner, made plans to visit colleges together, and that he even confronted her manager for alleged inappropriate conduct. They exchanged Christmas gifts and obtained matching tattoos. The Appellant initiated approximately a dozen of **Victim's** visits to his house. **Id**. at 138, 143-146; N.T. June 19, 2019 p. 21,24, 27,34-35). The Appellant admitted he texted **Victim**: "You should

25

visit today. Shh." (**N.T. June 19, 2019. p. 26-27**). The Appellant also admitted he texted [Victim]: "I love you," and then incredulously explained, "I love all of my students." **Id.** at 36-37.

The Appellant, and the Appellant's wife testified to providing [Victim] with a home environment, responsible for the welfare of [Victim]. Therefore, the Appellant held a duty to act and did more than merely forego notifying administration or a guidance counselor of [Victim]'s suicidal ideations. Indeed, the Commonwealth presented exhaustive evidence that the Appellant encouraged an intimate and sexual relationship, possessing awareness of [Victim]'s young age, personal vulnerabilities, and family separation. The Appellant befriended [Victim] and exploited the teacher/student relationship he had with [Victim], especially any trust and competence [Victim]'s family had bestowed upon the Appellant and his wife due to their positions. He privately communicated with [Victim] frequently and inappropriately, instructing her to delete conversations, admonished her decisions, blurring boundaries between a teacher and student by coaxing [Victim] into a sexual relationship, and shifting blame on his wife. At times, the Appellant would involve his wife, and his wife would knowingly participate. On other occasions the Appellant concealed his "visits" or "hangs" with [Victim], arriving at her place of employment alone or initiating visits and telling [Victim] to "shh." Most egregiously, the Appellant gifted [Victim] with a vibrator and then kept the vibrator located in the bathroom at his residence. The Appellant and his wife permitted unrestricted access to their personal life and home, separate from school activities, family, or peers. In fact, the Appellant initially manipulated [Victim] to break-up with her boyfriend, and then perpetuated the notion that [Victim] could only rely on the Appellant. (**Notes to Testimony, June 17, 2019 p. 33-34, 42-43**). The Appellant expressed that "nobody was going to be able to treat [Joella] better than he would." **Id.** at 43. Oddly, the Appellant confronted [Victim]'s manager accusing him of inappropriate conduct, dishonestly playing the role of her "brother," and

threatening police intervention when, the Appellant was engaged in even worse sexual behavior with [Victim]. Obsessively, when the Appellant did not have contact with [Victim], he would initiate contact for a response and/or berate her until he received the reaction he sought, isolation from others and reliance on the Appellant. Ultimately, the Appellant failed to take protective action, instead he fostered opportunities for sexual activity to occur within his home, and during overnight stays, including in the presence of his wife. He knowingly placed [Victim] in circumstances where she would be alone with him on several occasions, or in circumstances where despite his wife's presence, he knew and [Victim] knew that the Appellant's wife would conceal the occurrences of sexual activity. The Appellant manipulated [Victim's] relationship with his wife to the point that [Victim] knew she could not rely on the Appellant's wife to protect her from the abuse or to notify law enforcement. The Appellant's wife held an apparent motive to keep her marriage intact, as well as her teaching position and reputation.

The jury's verdict and finding of a course of conduct as to Count II was clearly not against the weight of the evidence, especially considering the inherent bias woven throughout the Appellant's wife's testimony.

This Court did not abuse its discretion by denying the Appellant's Post–Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding Count II.

The Appellant's challenge to the weight of the evidence regarding Count III-Corruption of Minors -Defendant age 18 or above, **18 Pa C.S. §6301(a)(1)(ii)**, also lacks merit, despite no physical corroborative evidence as the Appellant alleges. Upon review, this Court found the testimony of [Victim] to be credible and reliable enough for the jury to return a verdict of guilty and a finding of a course of conduct. [Victim] testified with significant specificity concerning the sexual encounters with the Appellant occurring over two (2) years. As previously cited above,

27

the uncorroborated testimony of Victim, if believed by the trier of fact is sufficient to support a conviction of a sexual offense. See **Commonwealth v. Bishop**, 742 A.2d 178, 189 (Pa. Super. 1999); **Commonwealth v. Davis**, 650 A.2d 452, 455, 477 (Pa. Super. 1994)(uncorroborated testimony of sexual assault victim, if believed by the trier of fact, is sufficient to support convictions even if the defense presents countervailing evidence); **Commonwealth v. Trimble**, 615 A.2d 48, 50 (Pa. Super. 1992) (testimony of child victim alone sufficient to support conviction for sex offenses). Also, medical evidence is not required if the fact finder believes the victim. **Commonwealth v. Jette**, 818 A.2d 533, 534 (Pa. Super. 2003) *citing* **Commonwealth v. Owens**, 549 A.2d 129, 133 (Pa. Super. 1994); **Commonwealth v. Castelhun**, 889 A.2d 1228, 1232 (Pa. Super. 2005).

Additionally, the definition of the corruption of minors, includes, "[actions that] would offend the common sense of the community and the sense of decency, propriety and morality, which most people entertain." **Commonwealth v. Leatherby**, 116 A.3d 73, 82 (Pa. Super. 2015). Pennsylvania courts have determined that acts of sexual abuse fall under this definition of actions that would offend "the sense of decency, propriety and morality, which most people entertain." **Id.**

In the instant case, Victim established that the Appellant initially encouraged her to act on urges and feelings. Victim stated: "he had told me [ . . . ] that at some point that we should kind of act on those feelings [ . . . ] that we should just kind of kiss and get over it." (N.T. June 17, 2019 p. 44). She noted that the Appellant privately communicated with her "pretty much around the clock. It didn't really matter what time of day that it was." **Id.** at 42. From these communications, Victim believed that the Appellant held "some sort of feelings towards [her]." **Id.** at 43. Thereafter, Victim testified to at least ten (10) additional sexual incidences with the

28

Appellant, including performing oral sex on the Appellant, digital penetration, receiving oral sex from the Appellant, and engaging in anal sex with the Appellant. **Id.** at 46-50, 78. She described the first occasion when oral sex occurred. [Victim] testified: "I was sitting on one of the couches and Nick was sitting on another couch [ . . . ] and then he was kind of like, Why are you sitting on that couch when you can come over and sit here with me? And then it was kind of, like, you know, you shouldn't be wearing pants [ . . . ] that day he also touched me, and then I did oral on him that day." **Id.** at 47. Similarly, [Victim] recalled that the Appellant pressured her into having anal sex stating that "it was something that Ruth wouldn't do with him and that he had never done that with anybody and that I was his last chance [ . . . ] it was a first that he wanted to have with me; and I believed that at the time." **Id.** at 49. Additionally, [Victim] recalled that the Appellant's wife also engaged in sexual activity with her, wherein, the Appellant's wife and [Victim] both performed oral sex on the Appellant. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." **Id.** at 50. [Victim] testified that she and the Appellant's wife simultaneously performed oral sex on the Appellant. **Id.** at 51, 83. [Victim] explained that she would regularly sleep at the Appellant's house overnight. **Id.** at 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [ . . . ] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." **Id.** at 58. [Victim] also explained that on some occasions, the Appellant groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and his wife. **Id.** at 58-59. [Victim] even discussed moving into

29

the couple's house. **Id.** at 57. She recalled other occasions wherein the Appellant's wife would be downstairs while [Victim] smoked marijuana with the Appellant upstairs. **Id.** at 59. Joella noted several occasions when the Appellant provided her with wine or liquor and weed. **Id.** The Appellant also provided her with a vibrator that he utilized on Joella when she came to his house. **Id.** at 60. She testified that the vibrator was kept in the Appellant's house "upstairs in one of the bathroom drawers." **Id.** at 60. The Appellant admitted that he texted [Victim], "I love you," and instructed her when to "check her Snap." The Appellant admitted to over 12,000 contacts with [Victim] over a five (5) month period and revealed that he frequently initiated contact and often invited [Victim] to his residence sometimes with his wife's knowledge and sometimes when he was alone. [Victim] testified that the Appellant instructed her to delete any contact of a sexual nature either message or Snap, wherein [Victim] complied and was unable to provide any content to the Commonwealth. She testified that the Appellant would know if she saved a Snap and he was prompt about making sure that content became deleted.

The Appellant provided a parallel timeline and account of events, yet denies any sexual activity, and this does not necessitate a finding of not guilty. The jury chose to credit [Victim's] testimony and her testimony alone establishes a corruption of minors conviction. It is clear that the Appellant's actions encouraged [Victim], a sixteen (16) year old girl to engage in sexual conduct with an adult couple, the Appellant and his wife, and to hide any evidence of this sexual activity, which most people would find offensive to their common sense of decency. [Victim's] testimony revealed that the Appellant's actions and the Appellant's wife's actions, especially their daily communications conditioned [Victim] to accept the sexual conduct and be deterred from reporting the abuse. This Court does not find that any of [Victim's] testimony was contradicted in a manner that would cause this Court to find the verdict is against the weight

30

of the evidence. Therefore, this Court did not abuse its discretion by denying the Appellant's

Post–Sentence Motion for an acquittal or for a new trial based on the weight of the evidence

regarding Count III.

The Appellant challenges the weight of the evidence regarding Count IV- Furnish Liquor

or Malt Beverage to a Minor, **18 Pa. C.S. §6310.1(a)**, by arguing that there was no evidence of

Victim's ▮▮▮▮ influence, ingestion or effects of alcohol. Victim ▮▮▮▮ testified that the Appellant and the

Appellant's wife "usually" provided wine or liquor as well as "weed." (**N.T. June 17, 2019 p.m.**

**p. 59**). Victim ▮▮▮▮ stated that she smoked marijuana with the Appellant at his residence. Specifically,

she described smoking marijuana upstairs in a spare room in the Appellant's residence. **Id.**

Likewise, the Appellant testified that he smoked marijuana several times in his residence. (**N.T.**

**June 19, 2019 p. 38**). He admitted to drinking alcohol and being familiar with the effects of

alcohol. **Id.** at 38-39.

The facts elicited by the Commonwealth reveal that knowing Victim ▮▮▮▮ was underage, the

Appellant provided wine or liquor and weed to Victim ▮▮▮▮ and allowed consumption on several

occasions. In fact, Victim ▮▮▮▮ utilized the term "usually," which a reasonable jury could infer that the

Appellant and the Appellant's wife provided Victim ▮▮▮▮ with alcohol and weed on more than one

occasion. Proof of influence, ingestion or effects of alcohol on Victim ▮▮▮▮ are not required for a jury

to convict the Appellant under **18 Pa. C.S. §6301.1(a)**. The jury's finding was supported by the

factual record.

Therefore, this Court did not abuse its discretion by denying the Appellant's Post–

Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding

Count IV.

Ultimately, this Court will not substitute its judgement for the finder of fact, who is free

31

to believe all, part, or none of the evidence, and assess the credibility of the witnesses. See Commonwealth v. DeJesus, 860 A.2d 102, 107-108 (Pa. 2004)(holding that questions concerning inconsistent testimony trigger the credibility of the witnesses). Clearly, the jury found the testimony of the Commonwealth's witnesses, including the victim, ███, to be consistent, credible and reliable enough to return a verdict of guilty on all charged offenses.

As such, the jury's decision to credit the witnesses' respective statements does not render the verdict contrary to the evidence presented. A review of the record does not indicate that the verdict is "so contrary to the evidence as to shock one's sense of justice." Accordingly, this Court concludes that the Appellant's claims are without merit as this Court did not abuse its discretion. See Commonwealth v. Cramer, 195 A.3d 594, 601 (Pa. Super. 2018) (when trial court finds verdict not against weight of evidence, appellate court must give gravest consideration to trial court's conclusion because it had opportunity to hear and see evidence present).

5. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Endangering of Welfare of Children when the Commonwealth failed to present evidence establishing that there existed a duty of care and support for the alleged victim and/or that the duty of care and support was in any way violated?**

6. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Furnishing Alcohol to a Minor when the Commonwealth failed to present sufficient evidence that an actual alcoholic beverage was furnished to a minor in that there was no testimony regarding victim's knowledge of or prior experience with alcoholic beverages, or testimony regarding any impact suffered as a result of ingesting the purported "alcoholic" beverage?**

The Appellant's claims five (5) and six (6) contend that there is insufficient evidence to sustain his convictions on Count II, Endangering the Welfare of Children- Parent/Guardian;

32

Count IV, Furnish Liquor or Malt Beverage to a Minor. The standard of review in assessing whether there was sufficient evidence to sustain Appellant's convictions is well settled:

> In reviewing the sufficiency of the evidence, [the Court] must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt [ . . . ] [the Court] may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

**Commonwealth v. Thomas**, 988 A.2d 699, 670 (Pa. Super. 2009), *appeal denied* 4 A.3d 1054 (Pa. 2010); **Commonwealth v. Woods**, 638 A.3d 1013, 1015 (Pa. Super. 1994)("The entire trial record must be evaluated and all evidence received must be considered.")

Viewing all evidence in the light most favorable to the Commonwealth, the verdict winner, this Court finds that there was sufficient evidence from which the jury could conclude that the Appellant was guilty as to Count II and Count IV. As such, this Court incorporates the aforementioned reasoning for the Appellant's weight of evidence claims in issues two, and four in this section, respectively.

Endangering the welfare of a child, which is defined, in relevant part, as follows:

**§ 4304. Endangering Welfare of Children**

> (a) Offense Defined.—
> (1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

**18 Pa. C.S. § 4304.**

An individual is not required to be a parent or legal guardian of a child to be found guilty of endangering the welfare of a child. **Commonwealth v. Trippett**, 932 A.2d 188, 195 (Pa. **Super. 2007).** "The language of the statute indicates that any 'other person' who supervises the

33

child is eligible to be charged and convicted under the statute." **Id.** Under the supervision element of the statute, it is not the child that the appellant must have been supervising but, rather, the child's welfare, and the requirement of supervision of a child's welfare is not limited to only certain forms of supervision, such as direct or actual, but, by its plain terms, the statute encompasses all forms of supervision of a child's welfare. **Commonwealth v. Lynn**, 114 A.3d 796 (Pa. 2015). Pennsylvania courts have established a three-part test that must be satisfied to prove Endangering the Welfare of Children:

(1) [T]he accused [was] aware of his/her duty to protect the child;

(2) [T]he accused [was] aware that the child [was] in circumstances that could threaten the child's physical or psychological welfare; and

(3) [T]he accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

**Commonwealth v. Pahel**, 689 A.2d 963, 964 (Pa. Super. 1997)(quoting **Commonwealth v. Cardwell**, 515 A.2d 311, 315 (Pa. Super. 1986).

In **Commonwealth v. Taylor**, 471 A.2d 1228 (Pa. Super. 1984), the Pennsylvania Superior Court discussed the legislature's intent in enacting section 4304 and its broad statutory purpose:

> The Supreme Court has said that [s]ection 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted. **Commonwealth v. Mack**, 359 A.2d 770, 772 (Pa. 1976). Thus, the "common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." **Id.**, quoting **Commonwealth v. Marlin**, 305 A.2d 14, 18 (Pa. 1973).

After a review of the record, the Commonwealth presented sufficient evidence which, if

believed, would support the jury's Endangering Welfare of Children verdict. Although the Appellant claims to have violated no duty of care, [Victim's] testimony as well as the Appellant himself, and the Appellant's wife established that [Victim] spent innumerable meals and nights at the Appellant's house including over a dozen sleepovers, attending events together, visiting [Victim] at her job, exchanging gifts, and joining on a trip together, as well as obtaining matching tattoos. [Victim] testified while under the supervision of the Appellant and the Appellant's wife, [Victim] and the Appellant would engage in sexual activity, and on one occasion the Appellant's wife participated in the sexual activity. [Victim] explained she saw the Appellant and the Appellant's wife weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often. The Appellant even allowed [Victim] to shower at the house. (N.T. June 17, 2019 p. 41, 51, 75). She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [ . . . ] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." Id. at 58.

Initially, [Victim] recalled a conversation with the Appellant, wherein he told [Victim] that his wife believed him and [Victim] should act on their urges and kiss. The Appellant manipulated [Victim] into thinking that his wife, [Victim's] teacher and band instructor, approved of the sexual activity. Id. at 43. [Victim] testified: "he had told me that they had kind of talked about it and that she said that at some point that we should kind of act on those feelings [ . . . ] that she had said that we should just kind of kiss and get over it." Id. at 44. Afterwards, when the Appellant's wife returned to the apartment, [Victim] learned: "once, I was there Ruth had kind of said that there was not to be anything more than kissing. So when that was happening Nick was kind of like,

35

well, why should there be boundaries on emotions or feelings [ . . . ] why don't you let me, [ . . . ] make you feel better." **Id.** at 45.

Victim ~~████~~ also recalled conversations wherein the Appellant would instruct her to delete anything of a sexual nature. (**N.T. June 18, 2019 a.m. p. 6**). Victim ~~████~~ testified: "he didn't want anybody to know about what was going on in the Snapchats [ . . . ] like anything we talked about regarding anything sexual." **Id.** at 6. She explained: "Nick was always prompt about making sure that I didn't save anything." (**N.T. June 17, 2019 p. 68**). Clearly, the Appellant's instructions were not for the purpose of safeguarding or protecting the welfare of Victim ~~████~~ nor was the initial sexual encounter authorized or recommended by his wife.

Since that initial sexual encounter, however, Victim ~~████~~ testified to "more than ten" other sexual encounters with the Appellant's husband, involving oral sex, digital penetration, and anal sex. Also, an occasion where Victim ~~████~~ and the Appellant's wife both performed oral sex on the Appellant at his wife's design and direction, in furtherance of a bribe she employed to coerce her husband into attending a family dinner. **Id.** at 46-56. Moreover, Victim ~~████~~ testified that the Appellant's husband purchased a vibrator for Joella and operated the vibrator on Victim ~~████~~. She noted that the vibrator was kept in the Appellant's upstairs bathroom drawer. **Id. at 60.**

It is apparent that the Appellant took actions that cannot reasonably be expected to protect the welfare of Victim ~~████~~, knowing she was "at-risk," and susceptible to improper influence. (**N.T. June 19, 2019 p. 11-12, 15**). Instead, the Appellant facilitated "non-stop" conversations (approximately 12,000 phone/text contact at all hours = 80 phone/text contact per day), living arrangements, and situations that fostered inappropriate sexual activity with Victim ~~████~~, while also instructing Victim ~~████~~ to conceal this activity, and discouraging her from having any meaningful or

emotional relationships with her family and her peers. At times, ~~Victim~~ would have to defend the Appellant's control over her, especially to her mother and father. **Id.** at 43.

Consistent with Detective Mancuso's testimony, and publication of the text content to the jury, revealed an obsessive, abusive, secretive, and controlling intimate relationship at the hands of the Appellant. (**N.T. June 18, 2019 a.m. p. at 66, 69, 75, 92, 94,97**). The Appellant texted ~~Victim~~: "Do your own shit, kid, because no one else gives a fuck about you but you and us." (**N.T. June 19, 2019 p. 28**). Also, the Appellant texted ~~Victim~~: "You should visit today, Shh." **Id.** at 27. He testified that he initiated over a dozen sleepovers with Joella yet acknowledged the prohibition against a teacher being alone with a student and a teacher texting a student at all hours of the night. **Id.** at 12, 24, 36-37. See <u>Commonwealth v. Lynn</u>, 114 A.3d 796 (Pa. 2015); <u>Commonwealth v. Bryant</u>, 57 A.3d 191 (Pa. Super. 2012)(sufficient evidence of duty of care to the victim and that duty was violated in a sexual abuse conviction where the defendant, a 34 year old man, and the victim a 13 year old girl were frequently present in the residence together alone, the defendant was the sole adult present in the home during the sexual assaults, the victim testified that she considered the defendant a family member, and the defendant testified that he was at the victim's home 4-5 days out of the week, occasionally picked the victim up from school, and was involved in the victim's care).

In the instant case the Commonwealth proved all three elements of Endangering the Welfare of a Child beyond a reasonable doubt. The Appellant had a duty of care towards ~~Victim~~, the sixteen (16) year old student he volunteered with on stage crew and was supervising. As a student and minor, it became imperative that ~~Victim~~ obey and accept the Appellant's direction and counsel, including his wife's direction and counsel. To that end, the Appellant was entrusted with control and responsibility over ~~Victim~~ in her parents' absence, for hours at a time, even

37

overnight. The Appellant violated that duty of care according to the testimony of both [Victim] and the Appellant, when he placed [Victim] in circumstances that endangered her physical and psychological well-being and deliberately acted in a manner that did not protect [Victim's] welfare. The Appellant's arguments to the contrary are entirely unavailing. Therefore, this Court concludes that the evidence was sufficient to find Appellant guilty of Endangering the Welfare of a Child.

Next, the Appellant challenges the sufficiency of the evidence with respect to his Furnishing Alcohol to a Minor conviction. "Selling or furnishing liquor or malt or brewed beverages to minors," provides in pertinent part:

> [A] person commits a misdemeanor of the third degree if [s]he intentionally and knowingly furnishes...any liquor or malt or brewed beverages to a person who is less than 21 years of age

**18 Pa. C.S. §6310.1(a).**

For purposes of Section 6310.1(a), "furnishing" means "[t]o supply, give or provide to, or allow a minor to possess on premises or property owned or controlled by the person charged." **18 Pa. C.S. § 6310.6.** The Appellant contends that there was insufficient evidence as to whether the beverage served was alcohol given the victim's lack of experience and lack of physical impact after ingesting. However, **75 Pa C.S. §6312 (a)**, provides, in pertinent part:

> In an action or proceeding ... in which a material element of the offense is that a substance is liquor or a malt or brewed beverage, all of the following apply:
>
> > (1) Chemical analysis is not required to prove that the substance is liquor or a malt or brewed beverage.
> > (2) Circumstantial evidence is sufficient to prove that the substance is liquor or a malt or brewed beverage.
>
> **Id.**

The evidence reveals that [Victim] testified that the Appellant "usually," provided her with "both"

38

drugs and alcohol. (N.T. June 17, 2019 p.m. p. 59). She stated: "It was usually their wine or liquor." **Id.** As to what type of drugs, [Victim] responded: "Weed." **Id.** [Victim] testified that her and the Appellant would smoke marijuana in a spare room upstairs while the Appellant's wife was downstairs. **Id.** [Victim's] testimony and observations, both direct and circumstantial is sufficient to support the jury's conclusion that the Appellant furnished alcohol and marijuana to a minor. See **Commonwealth v. Oliver**, 693 A.2d 1324, 1326-1327 (Pa. Super. 1997). Importantly, proof of intoxication, ingestion, or impact of alcohol is not required to sustain a conviction under **18 Pa. C.S. § 6301.1(a)**.

7. **Whether the trial court erred in failing to grant Defendant's pretrial motion for examination or in camera examination of the alleged victim's psychological records when the mental health of the victim was at issue in the trial, the records could have supported elements of Defendant's defense, and when there would have been no harm to the victim, as the defense sought an in camera review, and that any perceived harm to the victim would be substantially outweighed by the harm posed to the Defendant in not disclosing said records resulting in the abrogation of the Defendant's Sixth Amendment confrontation rights under both the United States and the Pennsylvania constitutions?**

**42 Pa. C.S. § 5944** sets forth the privilege between psychiatrists and patients. It states:

> No psychiatrist ... shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

**42 Pa. C.S. § 5944.**

The psychiatrist-patient privilege, modeled after the attorney-client privilege, codified a strong public policy that confidential communication made by a patient to her psychiatrist should be absolutely protected from disclosure. "Information which is protected by an absolute statutory privilege is not subject to disclosure." **Commonwealth v. Eck**, 605 A.2d 1248, 1252 (Pa. Super. 1992). The privilege afforded by § 5944 intends to inspire confidence in the client

39

and to encourage full disclosure to the psychiatrist, preventing the latter from making public any information which would result in humiliation, embarrassment or disgrace to the client, the privilege is designed to promote effective treatment and to insulate the client's private thoughts from public disclosure. **Commonwealth v. Kyle, 533 A.2d 120, 128 (Pa. Super. 1987).** To that end, Pennsylvania courts have unequivocally held that "the statutory privilege pursuant to Section 5944 is not outweighed by a defendant's right to cross-examine witnesses or his due process rights." **Commonwealth v. Dowling, 883 A.2d 570, 575 (Pa. 2005); Commonwealth v. Segarra, 228 A.3d 943, 957 (Pa. Super. 2020)**(holding that a criminal defendant accused of sexual offenses denied access to the alleged victim's records is not a constitutional violation as the records are statutorily privileged) **citing, Commonwealth v. Smith, 606 A.2d 939, 942(Pa. Super. 1992)**( [P]sychiatric records [that] are statutorily protected are not subject to discovery); **Commonwealth v. Counterman, 719 A.2d 284, 295 (Pa. 1998)**( "The statutory privilege set forth in Section 5944 is not outweighed by either a defendant's Sixth Amendment right to cross-examine a witness or his right to due process of law,"); **Commonwealth v. Patosky, 656 A.2d 499, 502-03 (Pa. Super. 1995)**(citing numerous cases in which a criminal defendant's constitutional rights to confrontation and due process must yield to privilege, and holding that the trial court's refusal to allow defendant's attorney to conduct *in camera* review of sexual assault victim's psychiatric records under section 5944 did not violate his constitutional rights to confrontation, compulsory process, and due process).

As such, Victim's communications with her counselor/psychiatrist were protected by the psychiatrist-patient privilege. Victim's communications with her counselor/psychiatrist were made in confidence while she sought professional psychiatric help. This Court must preserve the confidential relationship between the victim, and her psychiatrist in order to promote the

40

essential purpose of the statutory privilege—to encourage and foster full disclosure during psychiatric treatment. See **Commonwealth v. Kennedy**, 604 A.2d 1036, 1046 (Pa. Super. 1992)(holding that the trial court's *in camera* review of these records constituted error); **Commonwealth v. Moore**, 584 A.2d 936, 940 (Pa. 1991)(the general powers of courts do not include the power to order disclosure of materials that the legislature has explicitly directed be kept confidential, especially statutorily protected records of a victim).

Thus, because Victim's ~~[redacted]~~ mental health records are not subject to exception or discovery, and because Victim ~~[redacted]~~ has not consented to the records' disclosure,[11] the Appellant's constitutional rights are not violated in protecting the records from disclosure and *in camera* review. For all of the aforementioned reasons, the Appellant's claim is without merit, Victim's ~~[redacted]~~ mental health records are privileged, and cannot be disclosed to anyone, or be subject to an *in camera* review by anyone, without Victim's ~~[redacted]~~ consent.

Notwithstanding, the record indicates that the Appellant did have a full and fair opportunity to cross-examine Victim ~~[redacted]~~ as to her mental health, which satisfied the Appellant's confrontation rights. Because the privilege only limits access to statements made during the course of treatment by the psychologist, it does not foreclose all lines of defense questioning, which did indeed occur in this case. Counsel for the Appellant elicited testimony from Victim ~~[redacted]~~ regarding the encouragement she received from the Appellant about consulting a therapist. (N.T. June 17, 2019 a.m. p. 71). Counsel for the Appellant also elicited from Victim ~~[redacted]~~ that her family problems were taking a toll on her mentally, and that she suffered from depression and would engage in self- harm, specifically cutting. **Id.** at 71-72. Counsel elicited the length of time and regularity in which Victim ~~[redacted]~~ consulted with the therapist, approximately two (2) years, as well as

---

[11] See **Commonwealth v. Askew**, 666 A.2d 1062 (Pa. Super. 1995)(finding no waiver where the counselor reports a victim's allegations of sexual abuse to the police).

41

the year and month in which [Victim] disclosed the sexual abuse to her therapist. **Id.** at 80-81.

Accordingly, counsel for the Appellant effectively raised inferences helpful to the defense as to [Victim's] credibility, and potential bias, or motives. Lastly, this Court believes that [Victim's] mental condition was not at issue in this case and was irrelevant to the defense of the charges alleged. Under these circumstances, this Court properly denied an *in camera* review of the victim's privileged records.

8. **Whether the trial court erred in refusing to grant Defendant's request for a mistrial, following the prosecutor twice referring to the Defendant as a "pedophile," during close arguments prejudicing the jury so as to render a fair and impartial verdict?**

A motion for mistrial is within the discretion of the trial court and is required only when an incident is of such a nature that its unavoidable effect is to deprive of a fair and impartial trial causing prejudice to the defendant. It is within the trial court's discretion to determine prejudice. Therefore, the standard of review is whether the trial court abused that discretion. Notwithstanding, a prosecutor is permitted considerable latitude during closing arguments. A prosecutor's arguments are deemed fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Closing arguments must be evaluated in the context, in which they were made and in light of statements made during defense counsel's summation to which the prosecutor may respond. **Commonwealth v. Ligons,** 773 A2d 1231, 1238 (Pa. 2001). In advocating their case, "prosecuting attorneys have leeway to present their arguments with logical force and vigor, and they are permitted a degree of oratorical flair." **Commonwealth v. Laird,** 119 A.3d 972, 1010-11 (Pa. 2015).

Accordingly, prosecutorial misconduct is evaluated under a harmless error standard, and does not does not take place unless the unavoidable effect of the comments at issue prejudiced the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus

42

impeding their ability to weigh the evidence objectively and render a true verdict. **Commonwealth v. Caldwell**, 117 A.3d 763, 774(Pa. Super. 2015) *quoting* **Commonwealth v. Judy**, 978 A.2d 1015, 1020 (Pa. Super. 2009). A harmless error standard evaluates "whether a defendant received a fair trial, not a perfect trial." **Judy, at 1019-1020.**

Proper examination of the Commonwealth's comments in closing requires review of the arguments advanced by the defense in defense summation. As indicated, here, the defense was based essentially upon the notion that ▮▮▮ [Victim] fabricated the allegations against the Appellant and the Appellant's wife. The defense actively sought to portray the victim as dishonest and sought to characterize the Commonwealth's case as based on nothing more than the unsupported allegations of a troubled child. The defense closing included argument in the following particulars: that the case centered around the uncorroborated allegation of one girl, (N.T. June, 19, 2019 p. 51-54); that ▮▮▮ [Victim] recounted the allegations of abuse in an unbelievable and inconsistent manner; **Id.** at 51-54, 57-58; that ▮▮▮ [Victim] was particularly troubled and particularly likely to lie. **Id. at 60.** Further, as mitigating circumstances the defense closing referenced character evidence stating that "When you talk about the woman who is the in effect superintendent of the Fell Charter School gushing with praise for Nick. You talk about the counselor at the Charter School or the secretary, at the Charter School gushing with praise. They are of good character [ . . .] a cross-section of character witnesses can [ . . .] attest to the good character of these people [ . . . ] people of good character, I'm paraphrasing do not normally commit crimes. On that evidence alone, you can vote no guilty. That's the thing with character." **Id. at 66.** Defense counsel devoted a significant portion of closing argument to portraying the Appellant and the Appellant's wife as moral, upstanding, law-abiding teachers in

43

the community who could never commit such offenses. He argued that the teachers and administrators who taught with the Appellant and the Appellant's wife attested to these traits.

In response to defense counsel's argument, the prosecutor's remark was offered to counter character evidence by highlighting potential witness bias towards protecting the reputation of Fell Charter. In response, the prosecutor suggested, among other things, that sexual abuse occurs without witnesses and "behind closed doors," thus other teachers or administrators would be embarrassed to learn they work with a pedophile, especially a fellow educator. The consequences of Fell Charter employing a "pedophile," would be catastrophic to their employment, impacting their own livelihood. Therefore, the comments of the prosecutor represented a fair response to the defense's summation regarding character evidence. **See** **Commonwealth v. Judy**, 978 A.2d 1015 (Pa. Super. 2009)(holding that reference to defendant as pedophile and argument that tended to personalize these circumstances for jury did not warrant mistrial; references were made in direct response to defense contentions and represented fair means of attempting to persuade jury with a vigorous response to the defense); **Commonwealth v. Ragland**, 991 A.2d 336 (Pa. Super. 2010)(finding that the comments made by the district attorney constituted permissible oratorical flair when viewed in the context of defense counsel's contention that L.B. was a troubled child not worthy of belief, especially where the trial court promptly sustained Appellant's objection and properly instructed the jury).

Here, the prosecutor argued:

> And then you have the rest of the crew from Fell Charter testifying to Nick's good character, of course, the Baggettas are going to have good character; right? You want to talk about women who want to save — trying to get egg of their face, the three women from Fell Charter who are going to get up here and tell you, 'We never knew we had a pedophile working amongst us.' Of course they don't want that out about Fell. They don't want that to be the reputation of their school. Of course they are going to get up there and say they had no idea Nick

44

would do something like this. That he was salt of the earth. The best teacher up at Fell; right? He was such strong character [ . . .] you cannot be an educator in this state if you do those things, so for them to say at the time 2016 to 2018 they had good character of course they did, they were teachers, they had to legally.

**(N.T. June 19, 2019 p. 84).**

Clearly, the prosecutor was arguing that the Fell Charter character evidence was unreliable and ripe with personal motivations, urging the jury to view the character evidence with disfavor. As such, this Court found the prosecutor's statement permissible rebuttal of the Appellant's mitigation evidence. It is a fair inference that Fell Charter colleagues would be concerned about the consequences of the Appellant and the Appellant's wife's actions, especially as educators and how that would impact on the reputation of Fell Charter and their own employment. Given such context, this Court declined to conclude that the remark so prejudiced the jury that it could not weigh the evidence objectively and render a true verdict. A mistrial was not warranted on this contention. See **Commonwealth v. Hardcastle, 546 A.2d 1101, 1109 (Pa. 1988)**(holding that [a] new trial is not mandated every time a prosecutor makes an intemperate or improper remark).

The Appellant's remaining claim also concerns the following:

> And I submit to you you have heard all of the evidence. Not just ~~_Victim_~~ ; right? Which, by the way, the judge is going to tell you if you believe ~~_Victim_~~, if you believe what she told you beyond a reasonable doubt her word alone is enough to convict the defendants. Now, we do have – you know, we went through it, there is a number of other things that corroborate ~~_Victim_~~ version of events. Of course there is not going to be a person that saw this happen other than the two defendants; right? This is happening in the safety and the confines of their own home. This is happening in the safe space that they built for ~~Victim~~ so, of course, there is not going to be an independent witness; right? That's not how child abuse works and that's not how pedophiles operate. They don't do it out in the middle of the street. No.

**Id.** at 101-102.

In this context, the prosecutor is explaining the respective burden of proof as to uncorroborated victim testimony regarding a sexual offense and the dynamics, and realistic environment in which a sexual offense likely occurs. When viewed in a larger context, the prosecutor's two references, to the term "pedophile," in fact, was the prosecutor urging the jury to consider that realistically, sexual abuse is typically secreted. The only witness being the victim, and how that bears on the credibility of the victim, who might conceal the abuse and other character witnesses who testify to the improbability of abuse given an otherwise outwardly upstanding disposition of the alleged perpetrator. See **Commonwealth v. Ragland**, 991 A.2d 336 (Pa. Super. 2010)(finding that the comments made by the district attorney constituted permissible oratorical flair when viewed in the context of defense counsel's contention that L.B. was a troubled child not worthy of belief, especially where the trial court promptly sustained Appellant's objection and properly instructed the jury).

Moreover, any potential prejudice occurring by virtue of such term was ameliorated by this Court's instructions, which prohibited the jury to consider the term in their deliberations. This Court instructed: "Ladies and gentlemen, you've heard the term pedophile used in the closing. You are to disregard the term. There is no evidence in this case whatsoever in regard to legal or medical definition of pedophile in this case and so it's not appropriate to be considered in your jury deliberations." **Id.** at 103. The isolated and incorrect use of this term was perhaps unfortunate but it did not work to prejudice the jurors by forming in their minds a fixed bias and hostility toward the Appellant. The jury's ability to weigh the evidence objectively and render a true verdict was not impeded and most importantly this reference did not deny the Appellant the fair trial to which he is entitled. Thus, the Appellant's allegations of prosecutorial misconduct

46

are without merit and this Court did not abuse its discretion in refusing to grant a mistrial on this basis. This Court properly instructed the jury and the jury is presumed to have followed such instruction. See Commonwealth v. Thompson, 660 A.2d 68, 76 (Pa. Super. 1995); See also Commonwealth v. Sanchez, 82 A.3d 943 (Pa. 2013)( It is within the sound discretion of the trial court to determine whether a curative instruction, in response to a prosecutor's improper reference during closing argument, is necessary).

9. **Whether the trial court erred in imposing a sentenced and/or erred in failing to modify its sentenced pursuant to Defendant's Post-Sentence Motions, when the sentence was in the aggravated range of the Pennsylvania sentencing guidelines and the court failed to state sufficient reasons and/or relied on inappropriate and/or factors already contemplated by the statute under which Defendant was convicted?**

10. **Whether the trial court abused its discretion in the imposition of a sentence of 4 ½ -9 years' total confinement, which is in the aggravated range of the applicable Guidelines, in that it was not "necessary" to address the "nature and circumstances of the crime" in light of the history, character and condition of the Defendant and was not "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community and rehabilitative needs of the defendant?"**

The Appellant's claims nine (9) and ten (10) challenge the discretionary aspects of sentence. As observed in Commonwealth v. McLaine, 150 A.3d 70, 76 (Pa. Super. 2016), "[a]n appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right." Rather, a challenge to the discretionary aspects of a sentence, requires an appellant satisfy the following four-part test:(1) whether appellant has filed a timely notice of appeal, (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, (3) whether appellant's brief has a fatal defect, and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. Id. Accordingly, the appeal is timely, and preserved in the Appellant's

47

Post-Sentence Motion, therefore, this Court examines whether the Appellant raises a substantial question.

A substantial question as to the inappropriateness of a sentence under the Sentencing Code is present "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. Glass**, 50 A.3d 720, 727 (Pa. Super. 2012). In the present case, the Appellant cannot demonstrate that this Court acted inconsistently with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. Importantly, the sentence is imposed within the statutory limits. See **Commonwealth v. Dodge**, 77 A.3d 1263, 1272 n. 8 (Pa. Super. 2013)("Careful litigants should note that arguments that the sentencing court failed to consider the factors proffered in 42 Pa.C.S. § 9721 does not present a substantial question).

An allegation that a sentencing judge failed to state adequate reasons on the record for imposing an aggravated range sentence raises a substantial question for review. **Commonwealth v. Booze**, 953 A.2d 1263; 1278 (Pa. Super. 2008). However, "a sentencing court may consider any legal factor in determining that a sentence in the aggravated range should be imposed." **Commonwealth v. Stewart**, 867 A.2d 589, 592-93 (Pa. Super. 2005). Additionally, the statement of reasons on the record must reflect this consideration, and absent a manifest abuse of discretion, the sentencing court's decision regarding the aggravation of a sentence will not be disturbed. **Id.** at 593.

As such, facts regarding the nature and circumstances of the offense that are not necessarily elements of the convicted offenses, are proper facts to consider in deciding to

48

sentence in the mitigated range or the aggravated range. **Commonwealth v. Chilquist, 548 A.2d 272 (Pa. Super. 1988). See also, Commonwealth v. Darden, 531 A.2d 1144, 1149 (Pa. Super. 1987).** Additionally, trial courts are permitted to use prior conviction history and other facts already included in the guidelines, if they supplement other extraneous sentencing information. **Commonwealth v. Simpson, 829 A.2d 334, 339 (Pa. Super. 2003).** An aggravated range sentence is justified to the extent that the individual circumstances of the appellant's case are atypical, such that a more severe punishment is appropriate. **Commonwealth v. Fullin, 892 A.2d 848, 848 (Pa. Super. 2006).**

Moreover, if a presentence investigative report exists, Pennsylvania Appellate Courts shall presume that the sentencing court "was aware of relevant information concerning the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself." **Commonwealth v. Devers, 546 A.2d 12, 18 (Pa. 1988).** The **Devers** court further articulated that "it would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand." **Id.** See **Commonwealth v. Boyer, 856 A.2d 149 (Pa. Super. 2004); Commonwealth v. Burns, 765 A.2d 1144 (Pa. Super. 2000).**

Finally, a sentence of confinement must be "consistent with the protection of the public, the gravity of the offense as it related to the impact on the life of the victims and on the community, and the rehabilitative needs of the defendant." **42 Pa. C.S. § 9721(b).**

A sentencing court may determine a defendant's potential for rehabilitation by considering his demeanor, apparent remorse, manifestation of social conscience, and cooperation with law enforcement agents. **Commonwealth v. Begley, 780 A.2d 605, 644**

49

(Pa. 2001); Commonwealth v. Constantine, 478 A.2d 39 (Pa. Super. 1984); Commonwealth v. Gallagher, 442 A.2d 820 (Pa. Super. 1982). Likewise, the sentencing court can always consider the historic purposes of punishment in fashioning a sentence that is appropriate based on the facts and circumstances of the case and the specific defendant. Pennsylvania appellate courts have held that the factors to consider in punishment are incapacitation, deterrence, and rehabilitation. **204 Pa. Code § 303.11(a).**

Here, the Appellant cannot demonstrate that this Court acted inconsistently with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. Importantly, for sufficient reasons on the record, acutely aware of the applicable sentencing ranges, this Court imposed an aggravated sentence within the statutory limits as to three criminal offenses. This Court clearly expressed its consideration of the seriousness of the offenses, the length of time within which the abuse occurred, and exertion of means necessary to continue the abuse, the rehabilitative needs of the Appellant, and the mitigating circumstances when fashioning sentence. This Court stated:

> Mr. Baggetta, I can tell you that I have heard thousands –
> like, tens of thousands of cases, whether it be pleas or trials,
> and I've seen cases which were despicable in nature. In this
> particular case it's the jury that has found you guilty of these
> charges, and the Court is guided by that in regard to its
> sentencing. I can tell you that I read all the letters that were sent
> by family members and friends, and I feel for your families. I feel
> for your mother, your father. I feel for [ . . . ] the Flanagan family.
> And I feel most in regard to your daughter. As a result of your
> actions she doesn't have a mother and father there by her side
> raising her. That is damage from your criminal acts. And,
> unfortunately it's not the Court that has to reunite, its basically you.
> You have not only done that to your families, but you've taken a
> young woman, who by everyone's testimony, had mental health
> issues and emotional issues, and you were able to basically target
> her, groom her, and abuse her. What you did, and the power that you
> had, in your position, these vulnerable – all children. Its not just the
> one. It's all. And she will be scarred. Just like your daughter is

50

scarred, so too, the victim in this case will be scarred for the rest of her life. The Court finds that there are aggravating factors in regard to the matter. And based upon the facts, the number of text messages, the length of period of time, and the actions that were committed by you, that's the aggravated range based upon the jury's verdict.

**(N.T. January 14, 2020 p. 16-17.**

The above reasons reveal that while this Court referenced the Appellant's position and power in some part, this Court referenced the Appellant's power in relation to his undeterred conduct, underlying nature, and continuing circumstances of the offenses that occurred over two (2) years, as well as the high risk to the victim and other students, including the Appellant's targeting and grooming of the victim and the manner and means in which the Appellant exerted control over the victim, gaining access to the victim inside the school setting and preparing the victim for sexual assault outside of the school setting. The Appellant's "power," was beyond that of his volunteer teaching position. The Appellant's position is not the sole reason for his power over the victim. Indeed, the Appellant's created conditions in which he abused the victim verbally, emotionally, and sexually, escalating each time he sent her a text, a Snapchat, initiated a "hang-out," provided alcohol and marijuana or invited the victim to sleep over, bought the victim dinner or a gift. Therefore, the Appellant's reliance on the term "position" and "power," distorts the context in which the terms were utilized by this Court. Contrary to the Appellant's claim and considered within the whole context of this Court's statements, such factors are not impermissible considerations. This Court cannot consent to the Appellant's tolerant attitude of sexual abuse and blatant ignorance of mandated reporter policies. The Appellant's actions completely contravene his educational training and educational positions. He abandoned all professional ethics when he engaged in sex acts for over two (2) years with a 16-year-old female student whom he supervised on stage crew.

51

Importantly, the irreparable psychological damage the Appellant had caused upon the victim, including isolating the victim from her peers and her family; encouraging an intimate relationship to sexually victimize, despite knowing of the victim's delicate mental health led to the increased sentence. The Appellant intimidated the victim mentally and physically over long periods of time for the Appellant's own sexual gratification, even intimidating his wife to secret his sex acts and became involved in the sex acts with the victim. The Appellant's actions caused the victim more harm than she already suffered from her family dysfunction. This Court cannot ignore that the victim was subjected to the Appellant's control for several years as referenced in her victim impact statement. The victim advised this Court, and the Commonwealth reiterated: "He consistently made me feel like no one could possibly ever actually care for me except he and Ruth. He told me countless times that my parents didn't actually love me, which confused me immensely." (N.T. January 14, 2020 p. 4). At the time of sentencing, this Court articulated that it viewed the inherent seriousness of the offenses alongside the particular suffering of this victim in considering to aggravate the Appellant's sentence. As such, this Court determined that if the Appellant were not incapacitated, the Appellant would be at a greater risk to commit further offenses towards the victim and others. Such likelihood is apparent where the Appellant's livelihood is rooted in the educational system and the Appellant has demonstrated he is unable to manage his sexual deviancies in such a setting.

Therefore, that this Court may not exclusively use the Appellant's volunteer position in sentencing does not mean that it must ignore it, nor ignore the individual and atypical conditions that the Appellant's position, and especially his wife's position created for the victim. Trial testimony revealed that the Appellant did not have 80 phone contacts per day and sleep overs with other students. Ultimately, a review of the record reveals that this Court considered

52

additional permissible reasons for an aggravated range sentence. Given this Court's use of other permissible factors, an abuse of discretion did not occur in considering the Appellant's power and position when fashioning sentence. Therefore, the Appellant's allegation that this Court utilized an improper aggravating factor is without merit. See **Commonwealth v. P.L.S., 894 A.2d 120, 133 (Pa. Super. 2006)**(finding that even if the trial court considered an inappropriate factor at sentencing, "the court offered significant other support for sentencing in excess of the guidelines in this case").

Indeed, prior to imposing sentence, this Court did meaningfully consider the sentencing guidelines, as well as all section 9721(b) factors, including mitigating and aggravating circumstances as explained in the PSI, and as articulated by the Appellant himself, the Appellant's family members and argued by the Appellant's counsel. This Court also possessed the victim impact statement, including its recollection of the victim's lengthy testimony at trial. To that end, this Court sentenced the Appellant within the statutory maximum for the offenses charged.

On Count I: Intercourse/Sexual Contact with Student, **18 Pa. C.S. §3124.2 (a.2)(1)**, this Court sentenced the Appellant to eighteen (18) – thirty-six (36) months with three (3) of special probation. An aggravated range sentence. The maximum term for a violation of Intercourse/Sexual Contact with Student, **18 Pa. C.S. §3124.2 (a.2)(1)**, graded as a felony of the third degree is seven (7) years. **18 Pa. C.S. § 1103(3)**. The Appellant had an offense gravity score of six (6) and a prior record score of zero (0). Under the sentencing guidelines for such scores, the standard range of minimum sentence is three (3) to twelve (12) months. The aggravated range of minimum sentence for the above scores is eighteen (18) months.

53

On Count II, Endangering the Welfare of Children- Parent/Guardian, **18 Pa. C.S. §
4034(a)(1)**, this Court sentenced the Appellant to eighteen (18) – thirty-six (36) months with two
(2) years of special probation. An aggravated range sentence. The maximum term for a
violation of Endangering the Welfare of Children- Parent/Guardian, **18 Pa. C.S. § 4034(a)(1)**,
graded as a felony of the third degree due to the jury's finding of a "course of conduct," is seven
(7) years. **18 Pa. C.S. § 1103(3)**. The Appellant had an offense gravity score of six (6) and a
prior record score of zero (0). Under the sentencing guidelines for such scores, the standard
range of minimum sentence is three (3) to twelve (12) months. The aggravated range of
minimum sentence for the above scores is eighteen (18) months.

On Count III, Corruption of Minors-Defendant age 18 or above, **18 Pa C.S.
§6301(a)(1)(ii)**, this Court sentenced the Appellant to eighteen (18) – thirty-six (36) months. An
aggravated range sentence. The maximum term for a violation of Corruption of Minors-
Defendant age 18 or above, **18 Pa C.S. §6301(a)(1)(ii)**, graded as a felony of the third degree
due to the jury's finding of a "course of conduct," is seven (7) years. **18 Pa. C.S. § 1103(3)**. The
Appellant had an offense gravity score of six (6) and a prior record score of zero (0). Under the
sentencing guidelines for such scores, the standard range of minimum sentence is three (3) to
twelve (12) months. The aggravated range of minimum sentence for the above scores is eighteen
(18) months.

Lastly, on Count IV, Furnish Liquor or Malt Beverage to a Minor, **18 Pa. C.S.
§6310.1(a)**, this Court sentenced the Appellant to one (1) year special probation. A standard
range sentence. The maximum term for a violation of Furnish Liquor or Malt Beverage to a
Minor, **18 Pa. C.S. §6310.1(a)**, graded as a misdemeanor of the third degree is one (1) year. **18
Pa. C.S. § 1104(3)**. The Appellant had an offense gravity score of one (1) and a prior record

score of zero (0). Under the sentencing guidelines for such scores, the standard range of minimum sentence is RS(restorative sanctions)(non-confinement sentencing options such as community service or probation).[12] The aggravated range of minimum sentence is Restrictive Intermediate Punishment (RIP) – three (3) months. This Court sentenced the Appellant to one (1) year special probation.

Accordingly, this Court acknowledges that the sentences imposed were within the aggravated range in part for compelling reasons considering the particular circumstances of the offense and the character of the Appellant. The record belies the Appellant's claims, which in turn merit no relief. This Court disclosed awareness of the sentencing guidelines and complied with an oral explanation on the record. This Court imposed an aggravated sentence on three of the Appellant's offenses to comport with the Appellant's inability to appreciate the wrongfulness of his conduct as well as provide protection to the victim and other students. This Court found the nature of the Appellant's sexual victimization and grooming to be severe. If not for his arrest, the Appellant would have continued his employment in education, targeting other "at-risk" students. The danger the Appellant posed to other students outweighed the Appellant's rehabilitation, and the remorse he displayed at sentencing, notwithstanding the lack of remorse and blame shifting he displayed at trial. This Court personally observed that the Appellant did not appreciate the seriousness of his offenses nor the seriousness of his uncontrolled sexual deviancy. Also, the record is silent as to any further rehabilitation/mental health counseling[13] the Appellant sought or completed, nor did the Appellant cite or refute the record with proof of the same.

---

[12] See Commonwealth v. Wagner, 702 A.2d 1084, 1086 (Pa. Super. 1997).
[13] All factors that could have weighed in the Appellant's favor, had the Appellant availed himself of treatment opportunities.

The record illustrates ample reasons for the sentence imposed; thus Appellant's argument lacks merit. **See Commonwealth v. Gooding, 818 A.2d 546, 554 (Pa.Super.2003)** (trial court satisfied duty to make record of reasons for sentence imposed). Because this Court did not apply the guidelines erroneously, nor utilize an unreasonable application or impose an unreasonable sentence outside the guidelines, this Court requests that the Appellant's sentence be affirmed pursuant to **42 Pa. C.S.A. § 9781(c) and (d); See Commonwealth v. Walls, 926 A.2d 957, 961 (Pa. 2007)**(appellate review of discretionary aspects of sentence confined by statutory mandate of **42 Pa.C.S. § 9781**(c) and (d)).

11. **Whether the trial court erred regarding the sentencing of the Endangering the Welfare of Children count as a third degree felony, when the Criminal Information failed to allege a "course of conduct" required for the enhanced grading, regardless of the specific question posed to the jury on the verdict slip?**

Appellant was convicted by a jury of one (1) count of Endangering the Welfare of Children, a third degree felony. The jury specifically found that there was a "course of conduct," with regard to the Endangering Welfare of Children charge. **See Verdict Slip June 19, 2019.; Compare Commonwealth v. Morales, 251 A.3d 1222 (Pa. Super. 2021)**(under the EWOC statute, in order to grade the offense as a third-degree felony, a specific determination must be made that "the actor engaged in a course of conduct" of endangering the welfare of a child).

In analyzing a grading issue, the Pennsylvania Superior Court has recognized that "course of conduct" is not an element of the offense of Endangering the Welfare of Children, but it is an additional fact, a jury question that impacts the grading of the offense. **Commonwealth v. Popow, 844 A.2d 13, 18 (Pa. Super. 2004)**. Here, the Commonwealth alleged facts in the initial Criminal Information and Amended Criminal Information, which were proven at the time of trial to support the grading. Count II of the Criminal Information and Amended Criminal Information alleged between March 2015 and January 2018:

Endangering Welfare of Children-Parent/Guardian/Other Commits Offense
18 Pa. C.S. 4304(a)(1)- Grade: Felony 3; $15,000; 7 years;

being a parent, guardian, or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support, to wit: Nicodema Baggetta did engage in sexual activity and conversations with J.L. a 16 year old female

Further, in support of the endangerment charge and the additional factor of "course of conduct," the Commonwealth provided the extensive and detailed testimony of ▮▮ [Victim] describing conduct that occurred over a two-year period, coupled with 12,000 phone contacts via text or call with the Appellant, and 11,000 phone contacts via text or call with the Appellant's wife within a five-month period. Additionally, the Appellant admitted to purchasing a camera lens and a vibrator as gifts, dinners, invitations to "hang out," approximately a dozen or more sleepovers, obtaining matching tattoos, visits to ▮▮ [Victim's] job, confrontation with ▮▮ [Victim's] employer, exchanging Christmas gifts with ▮▮ [Victim], and "usually," providing marijuana and alcohol to ▮▮ [Victim]. Importantly and most egregiously, the Appellant engaged in sexual activity with ▮▮ [Victim] in at least "more than ten" encounters, involving oral sex, digital penetration, and anal sex as well as one occasion where ▮▮ [Victim] and the Appellant's wife both performed oral sex on the Appellant at his wife's design and direction, in furtherance of a bribe employed to coerce him into attending a family dinner. The jurors listened to the Appellant tell them he did not notify administration, nor refer ▮▮ [Victim] to the guidance counselor despite being concerned about ▮▮ [Victim's] mental health or suicidal ideations throughout a two (2) year period.

▮▮ [Victim] explained she saw the Appellant and the Appellant's wife weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often. The Appellant even allowed ▮▮ [Victim] to shower at the house. **N.T. June 17, 2019 p. 41, 51, 75.** She stated: "I wouldn't be able to remember how many times. It was

57

often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [...] I usually would sleep in their bed with them [...] there were a few times where I slept in the middle between the two of them." **Id.** at 58. Victim also explained that on some occasions, the Appellant groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and his wife. **Id.** at 58-59. Victim testified that the Appellant purchased a vibrator for her and operated the vibrator on her. She noted that the vibrator was kept in the Appellant's upstairs bathroom drawer, easily within the purview and access of the Appellant and his wife. **Id.** at 60.

At the outset of the relationship, Victim recalled a conversation with the Appellant, wherein he told Victim that his wife believed they should act on their urges and kiss. **Id.** at 43. Victim testified: "he had told me that they had kind of talked about it and that she said that at some point that we should kind of act on those feelings [...] that she had said that we should just kind of kiss and get over it." **Id.** at 44. Clearly, the Appellant's instructions were not for the purpose of safeguarding or protecting the welfare of Victim. Rather, the Appellant manipulated Victim into believing that her teacher and band instructor, the Appellant's wife acquiesced to a sexual relationship between Victim and the Appellant. Victim explained that while the Appellant's wife conducted at a music festival, Victim and the Appellant engaged in sexual activity. She stated that upon the Appellant's wife's return home, "Ruth had kind of said that there was not to be anything more than kissing." **Id.** at 45. Since that initial sexual encounter, Victim testified to "more than ten" other sexual encounters with the Appellant, involving oral sex, digital penetration, and anal sex. **Id.** at 46-56. The Appellant expressed that "nobody was going to be able to treat [Victim] better than he would." **Id.** at 43.

58

Clearly, the allegations and evidence did not comprise a single event, but separate and distinct instances of sexual activity and "non-stop" conversations. The record is replete with instances of inappropriate contact between the Appellant and [Victim] ▮▮▮, and the Appellant's wife and [Victim] ▮▮▮. Here, the Commonwealth presented evidence of multiple events, wherein the Appellant possessed awareness of [Victim's] ▮▮▮ young age, susceptibility, vulnerability, and the impact of his position of authority, disregarded every policy and procedure of a mandated reporter, as well as the impact of his wife's position of authority to engage in sexual activity with [Victim] ▮▮▮. The Appellant likewise encouraged an intimate relationship among himself, [Victim] ▮▮▮, and his wife. The Appellant befriended [Victim] ▮▮▮, manipulated his role as a teacher volunteer, exhaustively communicated with [Victim] ▮▮▮ and promoted bad behaviors. The Appellant and the Appellant's wife permitted unrestricted access to their personal life and home, including multiple overnight stays and sleeping in the same bed. Over a two year period, the Appellant failed to take protective action and fostered opportunities for sexual activity to occur and to conceal the sexual activity/ sexual conversations. Ultimately, the Appellant engaged in multiple acts of sexual activity with [Victim] ▮▮▮, describing the instances as "our relationship." For these reasons, the evidence supported a "course of conduct" finding.

Importantly, this Court properly defined "course of conduct" in its instruction and the jury was charged to determine and making a finding on "course of conduct." (N.T. June 19, 2019 p. 119). Pennsylvania law defines "course of conduct" as "multiple acts over time" or "a pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct." **Commonwealth v. Smith**, 206 A.3d 565, 566 (Pa. Super. 2019); **Commonwealth v. Gray**, 251 A.3d 1220 (Pa. Super. 2021).

59

As such, the jury was able to determine facts to support the grading of the Endangering Welfare of Children as a third-degree felony and understood that it was making a finding on "course of conduct." The record reflects that the Commonwealth alleged in the criminal information/ amended criminal information, and presented evidence at trial, of the additional factor of "course of conduct," and this Court instructed the jury on "course of conduct." Accordingly, the evidence is sufficient to establish the crime of Endangering the Welfare of Children as a third-degree felony, and this Court properly graded this offense at sentencing. Therefore, this Court's sentence as a third-degree felony is legal and the Appellant's claim is without merit. See **Commonwealth v. Smith**, 206 A.3d 551, 565 (Pa. Super. 2019)(finding appellant's grading argument meritless and case indistinguishable from **Popow**, where the criminal information charged corruption of minors as a third degree felony, consistent with the Commonwealth's evidence presented at trial that the Appellant engaged in the aforementioned actions on multiple occasions, and where the trial court gave a proper jury instruction with the "course of conduct" requirement); **Commonwealth v. Suarez**, 2016 WL 5210886 (Pa. Super. 2016)(finding that it is clear from the record that where the Commonwealth alleged in the criminal information and presented evidence at trial of the additional factor, and the jury was instructed on the element of "course of conduct," in order to convict, the trial court properly graded the offense at sentencing).

60

12. Whether the trial court erred in denying Defendant's Motion for Bail Pending Appeal when there was already a significant amount of time in jail served, and Defendant presents no threat to the community and/or victim, has both family and community support, presents no flight risk, as evidenced by the fact that while previously on bail he appeared for all required court appearances and committed no bail violations and desires to both begin the process of rebuilding his life and actively participate in the preparation of her appeal?

The Pennsylvania Superior Court has explained: "[w]e will review the lower court's order denying a bail application for an abuse of discretion and will only reverse where the trial court misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record show that [its] decision is a result of partiality, prejudice, bias, or ill will." **Commonwealth v. Bishop**, 829 A.2d 1170, 1172 (Pa. Super. 2003).

Here, the Appellant claims that this Court should have granted his motion for bail because the Appellant remained on bail without incident and was neither a threat to the community or flight risk.

**Pa. R. Crim. P. 521(b)(2)** provides, in relevant part as follows:

> when the sentence imposed includes imprisonment of 2 years or more, the defendant shall not have the same right to bail as before verdict, but bail may be allowed in the discretion of the judge

Id.

**Pa. R. Crim. P. 521(d)(2)** provides, in relevant part as follows:

> The decision whether to change the type of release on bail or what conditions of release to impose shall be based on the judge's evaluation of the information about the defendant as it relates to the release criteria set forth in Rule 523. The judge shall also consider whether there is an increased likelihood of the defendant's fleeing the jurisdiction or whether the defendant is a danger to any other person or to the community or to himself or herself.

Id.

Accordingly, this Court presided over the Appellant's trial and sentencing and, as such, is familiar with the nature of the offense, the character of the Appellant, his circumstances, and thus

61

held pertinent information on which to conclude that bail should be denied pending appeal. Contrary to the Appellant's claims, this Court denied bail pending appeal because he presented a threat to the community. As noted by this Court when considering the Appellant's sentence, this Court found the Appellant's actions to be predatory in nature and therefore presented a risk to the community, especially Lakeland High School students and band members. The Appellant demonstrated to this Court a cognitive distortion in that he is an adult and is incapable of managing and understanding sexually inappropriate behaviors towards minors. This Court found the Appellant's preoccupation with the victim and control of the victim troubling, especially where the Appellant knew his actions were illegal. The Appellant did not posit to this Court any treatment plan to assist with his cognitive abnormalities. While, the Appellant shows evidence of positive support systems within his family, the Appellant held those positive support systems at the time of the instant offenses and chose to engage in sexually inappropriate behavior for at least two (2) years, including investing an excessive amount of time, money, and energy in grooming the victim. It is in the context of trust that the Appellant exploited the student/teacher/mentor relationship. As such, this Court found the Appellant's support system to be an unavailing factor. Moreover, the Appellant held a teaching career, which was terminated due to the instant offenses, and has not demonstrated to this Court any other employment prospects unrelated to education or minors, while previously on bail. Since the Appellant is not gainfully employed, this factor is likewise unavailing. Finally, regardless of the Appellant's zero prior record, the Appellant was convicted of three serious felony offenses, and the issues raised as to the sufficiency of the evidence to support the convictions have little, if any, likelihood to prevail.

Additionally, the impact of incarceration on the Appellant is not exceptional from others sentenced for sexually inappropriate offenses towards minors, in light of the Appellant's privity to the victim and length of time in which the sexual abuse occurred as well as the Appellant's control over the victim, directing her to delete conversations of a sexual nature and conceal her visits to the Appellant's house. In making this bail determination, this Court balanced the appropriate factors, and did not abuse its discretion.

BY THE COURT:

Michael J. Barrasse, J.

CC: Notice of the entry of the foregoing Memorandum has been provided to each party pursuant to Pennsylvania Rule of Criminal Procedure 114 by mailing time-stamped copies to the following individuals:

**Lisa Swift, Esq.**
**Sara Varela, Esq.**
**Lackawanna County District Attorney's Office**

**Jennifer McCambridge, Esq.**
**Attorney for the Appellant**